SOUTHERN RAILROAD COMPANY *v.* JOHN R. KENDRICK and WIFE.

1. COMMON CARRIERS: NEGLECT OF DUTY BY EMPLOYEES OF: EVIDENCE OF, AT A TIME PREVIOUS TO THE WRONG COMPLAINED OF, NOT ADMISSIBLE.—In an action against common carriers for a neglect of duty by the employees thereof, it is not admissible to show that the employees, at times previous to the commission of the wrong complained of, have failed to discharge the duties imposed upon them; the evidence of neglect must be confined to the time of the injury. *Miss. Central R. R.* v. *Miller.*

2. COMMON CARRIERS: CARRIERS OF FREIGHT AND PASSENGERS: DIFFERENCE OF OBLIGATION.—The obligation of a common carrier of goods is to carry and deliver; as to passengers, it is to carry and allow sufficient time and opportunity, at the point of destination, to leave the conveyance in which transported.

3. RAILROAD COMPANIES: DUTY TO ANNOUNCE AND STOP AT STATIONS.—Railroad companies, in order to afford an opportunity to passengers to leave the train of cars at the place of destination, are bound to have announced the names of the different stations upon the arrival of the train at them, and then stop a sufficient length of time to allow passengers to get off without danger or injury to their persons.

4. RAILROAD COMPANIES: ESTABLISHED USAGE AND GENERAL REGULATIONS: PARTIES DEALING WITH, TO CONFORM TO AND TAKE NOTICE OF.—Parties dealing with railroad companies and common carriers are bound to take notice of and conform to established usage and custom, and such regulations as are necessary for the convenience of both parties, and the proper government of the business of the carrier, not contrary to law and the contract of the parties.

5. COMMON CARRIERS: DUTY OF PASSENGERS.—It is the duty of passengers, transported by common carriers, to exercise reasonable care to avoid accidents, and to take notice of, and act upon, established usage, custom, and necessary regulations of the carrier; and if an injury sustained was in any degree caused by the negligence or want of care of the passenger, or resulted from his failure to obtain a knowledge of, and act upon, the established usage, custom, and regulations, the injury is the result of neglect, and the passenger cannot reasonably complain. 32 Penn. State R. 294–6; 19 Conn. 566; Redfield on Railways, 330, 296, 28; 6 Hill (N. Y.), 157; 31 Miss. 192.

6. INSTRUCTIONS TO JURY: CONFLICTING, ERRONEOUS.—It is improper to give to the jury conflicting instructions, even though one of them may announce the law correctly. Such instructions leave it to the jury to determine which of two contrary rules they will follow.

7. COMMON CARRIERS: ACTIONS OF TORT AGAINST: JURY AUTHORIZED TO IMPOSE EXEMPLARY DAMAGES, WHEN.—In all actions of tort against common carriers, the jury are authorized to find exemplary damages, when they consider the personal wrong and injury of such a character as, *in their judgment*, to call for the imposition of exemplary damages. 36 Miss. 666.

8. ACTIONS OF TORT: DAMAGES: JURY TO DETERMINE.—In actions of tort, the jury are vested exclusively with the power to determine the amount of damages, and they, in their discretion, are to weigh all the circumstances of the case, to consider the age, sex, degree, state, quality, trade, or profession of the party injured, as of him who did the injury, and determine accordingly.

9. COMMON CARRIERS: ACTIONS AGAINST, FOR NEGLECT OF DUTY: EXEMPLARY DAMAGES, WHEN JURY NOT JUSTIFIED IN FINDING.—In actions against common carriers for neglect of duty, where the neglect is clearly unattended with any circumstances of insult, of aggravation of feelings, of injury to the person or his property, or of bodily or mental suffering, the jury will not be justified in finding exemplary damages. The jury are the sole judges of the *existence* and weight of such facts.

10. COMMON CARRIERS: SPECIAL DAMAGES.—In an action against a common carrier to recover special damages for a wrong or injury done, it is incumbent on the party complaining to show the special wrong or injury; otherwise, the jury can find nominal damages only.

ERROR to the Circuit Court of Newton county. Hon. John Watts, judge.

The third, fourth, sixth, and seventh instructions given for the defendant in error, and referred to in the opinion of the court, are as follows:

Third instruction. " The law has not intrusted the court with a discretion to estimate damages, but has devolved the power on a jury, as a matter of sentiment and feeling, to be exercised by them according to their sound discretion, duly weighing all the circumstances of the case, and considering the state, degree, quality, trade or profession of the party injured, as of him who did the injury."

Fourth. " In estimating damages, therefore, the jury have a right to take into consideration the sex of the plaintiff (defendant in error), the peril in which she was placed, and the mental and physical suffering which she underwent by the act of the defendant (plaintiff in error)."

Sixth. " If the jury believe the testimony of the witness, Mrs. Kendrick, that no alternative was left her but to get off the cars, and accept such terms as the conductor saw fit to offer, then there was on the part of defendant, not only a breach of contract, but a violation of the public duty of defendant (plaintiff in error), as a common carrier, for which vindictive damages may be given."

Seventh. " The jury in assessing damages are to allow not only just compensation for the injury, but to inflict proper punishment on the defendant for the disregard of public duty; and in such a case they may take into consideration, in adjusting the punishment, the pecuniary means of the defendant."

*W.* and *J. R. Yerger*, for plaintiffs in error, contended,

1. The form of action is material in this class of cases, as the question of damages depends on the form adopted. In the

case of *Hurst* v. *N. O. G. N. R. R.*, 36 Miss. 666, this court ruled, that the pleader intended to use the form under which he could obtain the largest damages. If the court adheres to this decision, it will treat the present as an action of tort, and thus enable the party to recover in that form of action, vindictive damages for an ordinary breach of contract, unattended with any circumstances of aggravation. The better rule is, where it is doubtful on the face of the declaration whether the action is in contract or in tort, to consider that form as intended which presupposes the least wrong on the part of the defendant. We will, however, consider this as an action of tort.

2. That a verdict was rendered against plaintiffs in error for the sum of $5,000. On the facts presented in this record, the verdict exhibits a reckless and glaring disregard of the rights of plaintiffs in error, and violates all principle and all law. The court would be justified, nay required, to set aside the verdict for excessive damages. "It creates the belief, that the jury were misled by passion, prejudice or ignorance." Sedg. on Dam. 601.

3. That there was no obligation on the conductor or the railroad company, to call out the names of the different stations. Such obligation must be derived from special contract, or from usage from which a contract could be implied, or from positive statute, or the common law. Neither the special contract nor usage is shown by the testimony; there is no statute requiring it, and it is not enjoined by the common law. It is only the duty of passenger carriers to stop at the usual places, and to allow the usual interval for refreshment. Story on Bailments, section 597.

The case of *Pennsylvania Railroad* v. *Kilgore*, 32 Penn. R. 294, is not in conflict with these views. The rule as laid down in that case is, "that in taking passengers aboard their cars, the company came under a contract to set them down safely at their place of destination, and that it was their duty to stop long enough to allow the passengers to get off."

4. That the difference of obligation of the carrier towards passengers and as to freight was marked, and grows out of the difference which necessarily exists between a party possessed of

volition, a free agent capable of taking care of himself, and therefore bound to exercise some diligence in looking to his own safety, and inanimate things, which are under the absolute dominion and control of the carrier, and which he can dispose of, or use, if dishonestly inclined, without the wrong being ascertained or detected. *Boyce* v. *Anderson*, 2 Peters' Sup. Ct. R.

Carriers of goods are bound to see that the goods are put off at the point to which they are shipped, because the goods have no volition, and must necessarily be delivered by the carrier. They are responsible for all injuries thereto, except those caused by the act of God and the public enemies, even in the absence of any negligence.

The reason of these stringent rules does not apply to passengers. They are able to take care of themselves, and it is their duty to take reasonable care to avoid accidents, and are presumed to get off and on the cars on reaching a station, if it suits them to do so. Pierce's Railway Law, 496.

A carrier is not responsible for an injury to a passenger, which would not have happened but for his negligence, or to which his negligence substantially contributed; and the rule applies in cases even where the carrier is chargeable with a breach of duty. Pierce on Railway Law, 475, 476, and cases there cited.

5. That a principal is never liable for vindictive damages for the wrongful or negligent act of his agent, unless he directed the act to be done, or after its commission ratified and approved it. See brief in case of *N. O. G. N. R. R.* v. *Bailey*.

6. That the rendition of vindictive damages is confined to cases "of gross negligence, or of wilful, wanton, and outrageous conduct;" or to cases in which "the elements of fraud, malice, gross negligence, or oppression mingle in the controversy." To find vindictive damages is not obligatory upon, but left exclusively to the discretion of the jury.

7. That the court should have taken into consideration, by way of mitigation of damages, the general character of the agent for faithfulness and good conduct. The general good character of the agent cannot shield plaintiffs in error from reparation for actual injury, but it can from vindictive dam-

ages, and especially in cases where only slight neglect is shown.

The duty of railroad companies is declared to be as follows:

" The company is bound to provide skilful and careful servants of good habits, and in every respect competent for the posts which they are appointed to fill as conductors, engineers, brakesmen, etc., and is responsible not only for the possession of such care and skill, but also for the continued application of these qualities at all times." Pierce's Railroad Law, 470, 471.

This responsibility is limited to compensation, except where the elements of gross negligence, fraud, malice, or oppression mingle in the controversy. Sedg. on Dam. 33, 34.

*J. H. Campbell,* for defendants in error, contended,

1. That no contract could have been made with plaintiffs in error by defendants, after the violation of their contract by defendants, which could relieve them from the liability already incurred ; *Atwood* v. *Reliance Trans. Co.,* 9 Watts, 87 ; *Jones* v. *Voorhees,* 10 Ohio, 145 ; *Hallister* v. *Nowlen,* 19 Wend. 234 ; *Cole* v. *Goodwin,* Ib. 251 ; *Camden R. R.* v. *Belknap,* 21 Ib. 354 ; *Gould* v. *Williams,* 2 Hill, 623 ; 7 Hill, 533 ; 2 Mich. 538.

2. That the common carrier warrants the safe delivery of goods or passengers in all but the excepted cases of the act of God and public enemies. 2 Kent's Com. 822.

This failure to deliver the passenger had taken place before there was any pretence of a contract to relieve from a discharge of body.

3. The slightest neglect or fault, *levissima culpa,* renders the common carrier liable. S. & M. 279 ; *Harrington* v. *McShane,* 2 Watts, 443.

4. That the jury, in estimating damages, if alone for the non-delivery of a passenger at the proper depôt, have the right to allow not only just compensation, but vindictive damages for the disregard of public duty. *N. O. G. N. R. R.* v. *Hurst,* 36

Miss. 660; *Heirn* v. *McCaughn*, 32 Miss. 166; *Bell* v. *Morrison*, 27 Miss. 68.

HANDY, C. J., delivered the opinion of the court.

This action was brought by the defendants in error, to recover damages sustained by the wife, by reason of the negligence of the conductor of the railroad train from Meridian to Newton station, in not stopping the train at that station, for which Mrs. Kendrick had purchased a ticket as a passenger, and in failing to give her notice when the train reached there; in consequence of which she was carried about two miles past that place, and the conductor, refusing to take the train back to the station, put her off at the place to which the train had gone, late at night, and placed her under the charge of two strange negro men to be conducted back to the station, she being alone and without a protector; and she was compelled to walk back to the station late at night, over dangerous bridges and almost impassable roads, in great bodily exposure and terror of mind. To this a demurrer was filed, assigning several grounds of objection; all of which were overruled, and we think properly, as they appear to be rather of the nature of pleas in bar than matters of demurrer. An amended declaration was then filed, stating in substance the averments of the original declaration, and alleging further, that the conductor was requested to back the train to Newton station, but refused to do so, and compelled Mrs. Kendrick to get off at the place to which the train had gone. To this and the original declaration, the defendant pleaded the general issue, and several other pleas amounting to the general issue.

On the trial, Mrs. Kendrick was introduced as a witness, and testified in substance that she purchased at Meridian a ticket for Newton station, took her seat in the car, and gave the ticket to the conductor when he called for it in passing through the train, a short time after leaving Meridian; that she was traveling alone and without a protector; that she did not know when the train arrived at Newton station, did not hear any one announce the station, and was carried to a water-tank about a mile and

a half beyond that station, and as the train was near that point, she learned by inquiry of a passenger, who inquired of the conductor, that they had passed Newton station; and thereupon that the conductor told her to stand where she was, and he went forward and returned shortly with two negro men with torchlights, and informed her that they would carry her valise back to the station, and assist her; that he told her it would be dangerous to take the train back to the station; that the negroes went back with her to the station, carrying her baggage; that she and they walked on the track, passed over two pieces of trestle work, one high with water under it; that she had some difficulty in passing over it, but was assisted by the negroes; that the place where she got off the train was swamp and woods, and she got back to near the station about three o'clock in the morning; that the conductor told her it was half a mile back to the station, and when she got back there, she was considerably fatigued; that she went back because she expected her brother to meet her there, and did not know what else to do. On cross-examination, she testified that she may have slept some, but very little, if any, while on the train; that at one time, when the train stopped, she looked up and saw buildings, and supposed it was Hickory station, but now believes it was Newton station; she did not know of the train stopping again until it stopped at the place where she got off; that she did not see the conductor after he received her ticket until she saw him where she got off; that she did not recollect that he proposed to carry her forward until they met the up-train and to send her back by that train, nor that he said, that if she insisted upon it, he would back the train to the station, or that he made any proposition to her; that he did not ask her to get off the train, but she got off because she preferred to do so, and did not know what else to do; that the conductor was every way respectful and polite to her, and the negroes were respectful and had good torchlights; that the conductor assisted her to get off the cars, and she made no objection to getting off and walking back, as she did not know what else she could do; that she was in no way injured, except the fatigue of walking; that one time, whilst she was

walking back, when one of the negroes asked the other for a stick, she felt much alarmed until she saw him put the stick in the handle of the valise, when her alarm ceased.

Doolittle, a witness for the plaintiff, testified, that he lives near Newton station, and that Mrs. Kendrick came to his house, as stated by her, some time after midnight; that the tank, where the plaintiff got off, is about one mile from his house, and that the road intervening, passes over swampy ground, there being two trestle bridges on it, one of which is about fifty feet long.

Maxcy was introduced by the plaintiff, and asked whether he had traveled on the Southern Railroad at any time previous to September, 1862, and if the conductor called out the stations at any time whilst he was on the train. To this the defendant objected, but the objection was overruled, and the defendant excepted. The same question was propounded to Wansley and Williams, witnesses introduced by the plaintiff, which was objected to, but the objection was overruled, and the witnesses allowed to answer it, and the defendant excepted. The first witness stated that in May, 1862, and the last two stated that previous to September, 1862, they had traveled from Newton station to Meridian on the road, and did not hear the conductor call out any station between these points.

The defendant then introduced the deposition of Lucy, which states, in substance, that he was the conductor of the train of the railroad when Mrs. Kendrick came on, as a passenger from Meridian to Newton station; that she came on board in the night, it being the night train; that the train reached Newton station about one o'clock at night; that on the arrival of the train there, the witness had the name of the station announced by one of the brakemen, and it was also announced by himself, at the door of the car in which Mrs. Kendrick was, and he stopped the train from seven to ten minutes, longer than the usual time, which is three minutes, because there was freight to be unloaded; that, after leaving the station some mile and a half, in going through the cars, he recognized Mrs. Kendrick as one of the passengers ticketed for Newton station; that his impression is, she was

asleep, and he approached and touched her on the shoulder, her face being turned from him, and her head seemed reclining on the back of the seat; that she turned around, and he asked her if she was not to get off at Newton station; she replied, "Yes; where are we now?" He replied, some mile and a half west of the station. She asked what she was to do, and he told her he was to meet an approaching train some distance west of there, and if she chose to stay aboard of the train until he met that train she could do so, and he would put her on that train, and send her back free of charge. She refused to do that; and he then told her there were two trustworthy boys of the road at the water-tank, where they were then about to stop, and he would send them back with her to Newton station with torch-lights, if she would accept of it, which she willingly agreed to; that he also informed her, that if she required it, he would back the train to Newton station with her, at the same time telling her there was some danger in backing the train with the engine he had, as it might possibly run off the track in backing, but that he did not think it his duty to carry her back, as he had announced the station, but for her accommodation he would do so; that she said she would not require that, and by sending the boys back with her, it would be satisfactory; and that was done; that the announcement of the station was made sufficiently loud and distinct for any passenger on the cars to hear it, if awake, and long enough to allow them to get off; that it was his impression that if he had backed the train to Newton station, there would have been some danger of a collision with the approaching train, by being out of time, and that he so told Mrs. Kendrick; and that on the arrival of the train at Newton station, he did everything that was usual and customary to notify passengers of the arrival at the station; and the witness was not in the employment of the company when his deposition was taken.

The president of the company testified, that the witness Lucy was well known to him, and he was a faithful and competent officer, attentive to his duties and ever regarded as one of the best conductors on the road; and Judge Watts testified to the same effect.

The first error assigned, is the overruling of the demurrer. But the grounds of demurrer set forth are manifestedly untenable, and do not appear to be urged here by the counsel for the plaintiff in error.

The second assignment is the admission of the testimony of the witnesses, Maxcy, Warnley, and Williams, to show that the conductors of the railroad had been negligent in calling out the names of the stations on the road, at a time prior to that at which the wrong here complained of was done.

This assignment was well taken. The question was whether the company, by its agent, was chargeable with neglect of duty at the particular time complained of by the plaintiffs; and it was not competent, upon the issue, to show negligence at another time, and by other agents of the company. This is settled in the case of the *Mississippi Central R. R.* v. *Miller*, at last term.

The third error assigned, is the instructions given by the court at the instance of the plaintiffs, the first of which is in these words:

"It is the clear duty of common carriers of passengers, not only to call out the different stations at which they arrive, and for which they have passengers, but to see that the passengers, with their baggage, are put off at the place of their destination."

The rule thus stated appears to place the duty of common carriers of passengers upon the same ground as that in relation to goods and other property delivered to them. But there is an essential difference between the duties in the two cases, proceeding from the difference in the nature of the objects to which the duties of the carrier apply. In the case of goods and other chattels, the object is either inanimate, or without reason and volition; is *delivered* to the carrier, and wholly within his power. It is mainly because he has absolute control over it, that he becomes an insurer of it for safe-keeping and delivery, from which nothing will discharge him but casualties by the act of God or of the public enemy, or the undue interference of the owner. But passengers on a public conveyance are of a different nature. They are persons, endowed with volition and capability of rational

locomotion. They are not *delivered* to the keeping of the carrier, but, of their own will, make use of his vehicle as a means of conveyance, and take their seats for the purpose of being transported from one place to another, coöperating with him in accomplishing the end of the undertaking, which is, to be safely carried to a given place, where it is to be presumed they will be careful to do what is necessary on their part to this purpose. In the case of goods, the obligation is to carry and deliver; as to passengers, it is simply to carry, and to allow them sufficient time and opportunity to leave the vehicle. In the latter case, it is presumed that they are desirous and ready to quit at their point of destination, and it is not the duty of the carrier to put them off; because, as rational beings, it is to be presumed that they will do what they expressly set out to do. A duty, therefore, devolves on the passenger; and it is, to use reasonable care and diligence to leave the vehicle, and to avail himself of the opportunity afforded him by the carrier to do so.

Yet; as passengers must necessarily often travel in such conveyances as railroads to places whose localities are entirely unknown to them, a duty devolves on the carrier, in order to afford them an opportunity to depart at their points of destination, to give notice of the arrival of the trains at such places. The mode of performing this duty by railroads, appears to be well established by general custom throughout this country—to be to announce, in a distinct and audible manner in each car, so that it may be heard by all passengers, the arrival of the trains at each station or fixed place of departure, and then to stop a sufficient length of time to allow the passengers to get off without danger or injury to their persons. And this proceeds upon the reasonable ground that they are vigilant to do their part of the undertaking which they set out to accomplish, and which is only to be done by their own exertion. All that is required of the carrier in such cases is reasonable warning, and such as may be presumed to be sufficient to give notice to those who are careful to do their duty. It would be unreasonable to require personal warning to each individual passenger, because it would require much time to do so in trains much crowded

25

with passengers; it would cause much detention in traveling, which would be a public inconvenience, and it would be to impose a duty on conductors, where there was a long train and many passengers, which it would require an extraordinary memory to perform properly, and which, therefore, would be often omitted through mistake or want of memory. It is better to require something to be done by the passengers, and all that is required by the prevalent custom is, that he shall use reasonable care and vigilance in attending to the business he has undertaken. If he fails to do this, he is chargeable with negligence, which will preclude him of complaining that the carrier has not done his duty.

The particular question presented in this instruction, so far as we have been able to find, has not been adjudged in any of the numerous cases, in regard to the duties and liabilities of railroad companies, that have arisen in our sister States and in England. But decisions have been made in analogous cases, founded on principles which appear to be fully applicable to this question.

In *Pennsylvania Railroad Co.* v. *Kilgore*, 32 Penn. State R. 294, adopted by the Supreme Court at page 296, it is said: "We do not think it was the duty of the conductor to go through the train and see that every person was safely passed out of the cars. It was his duty to stop the train sufficiently long to enable them to get out, without danger to their persons or lives; and if he did not, he was derelict in his duty." And in numerous cases, it is held that it is the duty of the passenger to take reasonable care in order to avoid accidents, and that he cannot recover if it appears that the injury sustained was in any degree caused by his own negligence or want of care. *Murch.* v. *Concord Railroad Corp.*, 9 Foster, 9; *Beers* v. *Hous. Railroad*, 19 Conn. 566; Redfield on Railways, 330. And if, by ordinary care, he might have avoided it, he cannot recover. Ib. And this rule is sanctioned by this court in *Vicksburg & Jackson Railroad* v. *Patton*, 31 Miss. 192.

In the excellent work of Mr. Redfield on railways, it is laid down as a rule applicable to the rights and duties of railroad

companies and their passengers, that the usages of any particular trade, such as are uniform or general, are presumed to be familiar to all persons having transactions in that trade or business." (Redfield on Railways, 296.) It is certainly the duty of the person dealing with such a corporation as a railroad company, to inform himself, if practicable, as to its established usage and custom in relation to the business in which he is concerned. Hence, he is presumed to know such usage or custom; and when the same is not contrary to law or the contract of the parties, if the person fails to obtain, or to act upon, this knowledge, he cannot reasonably complain of an injury that has resulted from his neglect. *St. John* v. *Van Santvoord*, 6 Hill (N. Y.), 157, per Walworth, Chancellor.

It is absolutely necessary to the proper management of the business of such a company, that there should be established rules for the government of their business with those who may be concerned in it; for without them the operations of the company would be embarrassed, if not impracticable; and the company has the power, and must, of necessity, establish such regulations as are reasonable for the mutual convenience of both parties, and not in conflict with law. (Redfield, 28.) And it is the duty of persons dealing with them to take notice of such regulations.

It is manifest that the instruction under consideration is in opposition to these views, and could scarcely have failed to mislead the jury in considering the evidence before them. Without expressing any opinion as to the weight of that evidence, it is proper to say, that there was evidence before them tending to show that the station was properly announced by the conductor, and that Mrs. Kendrick was asleep at the time and, therefore, did not hear it; and if the jury believed this testimony their verdict could not properly have been for the plaintiff. But under the rule stated in this instruction, it was immaterial whether the jury believed this to be the state of the facts or not, and they were nevertheless bound to find for the plaintiff. The instruction was, therefore, material to the facts in evidence, and was erroneously given.

This error was not obviated by the fourth instruction given at the instance of the defendant, in these words: "If the jury believe from the evidence that the cars stopped at Newton station the usual length of time, and the station was announced, then the railroad company are not liable for the plaintiff's failure to get off, and they will find for the defendant."

It is remarkable that this instruction states a rule in direct opposition to that stated in the first instruction given for the plaintiffs, and we are unable to perceive upon what principle the learned judge in the court below could have stated such opposite rules to the jury in the same case. The jury were left to determine which of the two contrary rules they would follow; and it would appear that they adopted the one which is errone ous. It was not only error to give the first instruction, but it was irregular to give conflicting instructions, and thereby, in effect, leave the jury without instruction to guide them with reference to a material question of law arising upon the evidence in the cause.

The second instruction for the plaintiffs is as follows: "In the assessment of damages the jury are allowed, and indeed it is their duty in such cases as that of public carriers, where the law provides no other penalty, to consider the interest of society as well as justice to the plaintiff, and by their verdict, whilst they make just compensation for the private injury, also to inflict proper punishment for the disregard of public duty."

This instruction was doubtless intended to be taken from what is said by this court in *New Orleans, Jackson & G. N. R. R.* v. *Hurst,* 36 Miss. 666. But the rule stated in that case has reference only to cases of personal wrong and injury, which the jury considered of such a character as, in their judgment, to call for the imposition of exemplary damages; and it holds that, if they so considered it from the evidence, it was their right and duty, in such cases, to find such damages. There is no such qualification in this instruction, but it directs the jury that, in suits against public carriers, it was their duty to make just compensation for the private injury, and also to inflict proper punishment for the disregard of public duty, in their

assessment of damages. Under this rule, the jury were bound to find punitory damages, if they found a verdict against the railroad, although they might have considered that the circumstances of the case did not justify or require such damages. It took away the proper discretion over the subject, which is the peculiar province of the jury; and the instruction, in its broad terms, was clearly wrong.

The third instruction is in the language of this court in the case last cited, and was properly given, and the fourth is but the legitimate deduction from it.

In the sixth, the court instructs the jury that if they believe the testimony of Mrs. Kendrick, and then proceeds to state what that testimony was, they might find vindictive damages. This was erroneous in stating to the jury what the testimony of Mrs. Kendrick was, that being a matter to be determined entirely by their judgment. It should also have contained terms of qualification that vindictive damages might be found, if in their judgment they thought that the facts as shown in evidence rendered it proper to do so; and the same qualification should have been added to the seventh instruction.

The ninth instruction is in these words: "Any failure to discharge all the duties imposed by the nature of the office of common carrier amounts to gross and wilful misconduct, for which punitive damages may be given; and the fact that the general character of the conductor was that of faithfulness, can in no manner shield the company where a positive wrong has been done."

The first branch of this instruction is manifestly wrong; for it is not every failure to discharge all the duties imposed by the nature of the office of the carrier that will constitute gross and wilful misconduct, for which punishment may be inflicted in damages. Whilst it is true that the utmost diligence is required of them in the performance of their duties, there may be cases of failure to do everything incumbent on them which, under the special circumstances, might be partially excusable, and would clearly not show gross and wilful misconduct in fact, or which, from the slight and immaterial nature of the wrong

resulting from them, would not justify punitive damages.  For example, if the taking of the plaintiff beyond Newton station was unjustifiable under the circumstances, and, upon the discovery of it by the conductor, he had backed the train to the station with but little delay to the plaintiff, that would have been a failure to discharge his duty ; but it could scarcely be said to be a case of gross and wilful misconduct, for which punitive damages should be inflicted for the wrong.

A neglect of duty, clearly not attended with any circumstances of insult, of aggravation of feelings, of injury to the person or his property, or of bodily or mental suffering, would not justify vindictive damages ; yet if there be any evidence tending to show such circumstances, its weight and force rest peculiarly in the discretion of the jury, whose verdict, either in point of determining the existence and weight of such facts, or in awarding damages for the wrong, will not be disturbed, except when it clearly appears that they are not warranted by the evidence.

In the present case, we do not intend to express any opinion as to whether the evidence was, or was not, sufficient to sustain a verdict of exemplary damages ; but we intend merely to say, on this point, that as a general proposition, the rule stated in the instruction is too broad.

That part of the instruction relating to the character of the conductor was correct, provided the jury should be of opinion that the evidence was sufficient to show negligence and wrong on the part of the conductor, under the rules above stated in considering the first instruction.

By the fifth instruction the court instructed the jury that in actions of tort against common carriers, special damage need not be proved.  This was improper, because it was indefinite, and calculated to mislead the jury.  If it be understood as holding, that when there appears, by the evidence, to be negligence in the carrier, to the wrong of the plaintiff, in such case the plaintiff is entitled to recover nominal damages without proof of special damage—to that extent ther ule was correct.  But if it be taken to hold, that when the carrier has been guilty of negligence,

Hurt *v.* Southern R. R. Co.

the plaintiff may recover special or exemplary damages, without any evidence tending to show circumstances of special injury or wrong, it was error ; and the instruction was calculated to be understood in this latter sense by the jury, and, therefore, should not have been given.

It is not necessary or proper to consider the assignment in relation to the motion for a new trial, on the ground that the verdict was contrary to the evidence. Since the evidence will again be presented to a jury on a new trial, to be weighed and considered by them, under proper instructions to be given by the court, it is not proper that we should say anything now that will prevent their free judgment upon the evidence.

For the errors above stated, the judgment is reversed, the verdict set aside, and the cause remanded for a new trial.