ILLINOIS CENTRAL RAILROAD COMPANY v. EDWARD W. REID.

[46 South. 146.]

RAILROADS. *Passengers. Ejection from train. Punitive damages.*

Where plaintiff sued a railroad company for his ejection from its through south-bound passenger train, the case justified the infliction of punitive damages against defendant, it appearing:—

(*a*) That plaintiff purchased a through round-trip ticket for continuous passage from his home, a station at which the company's fast trains did not usually stop, to a distant northern city and return; and

(*b*) Was advised by defendant's ticket agent when he purchased the ticket that the company's north-bound fast passenger train would be stopped for him and he would encounter no trouble in having its south-bound fast passenger train stopped for him to get off on his return home; and

(*c*) The north-bound fast passenger train was duly stopped at plaintiff's home station and he boarded it there and made his journey on it; and

(*d*) His ticket was duly honored for his return trip at the point where he began his return and on the company's south-bound fast train, until approaching the nearest regular stopping place for the train next before his home station, when he was informed by the conductor that he would have to get off as the train would not stop at plaintiff's home station; and

(e) Upon reaching such stopping place, the conductor, and a superior officer of the company found on the train, having power to order it stopped at plaintiff's destination, refused to listen to plaintiff's explanations and protests, and, in spite of plaintiff's insistence upon his ticket contract, he was put off, although the train from which he was ejected had been frequently stopped, under like conditions, to discharge other passengers at plaintiff's home station.

FROM the circuit court of Pike county.

HON. MOYSE H. WILKINSON, Judge.

Reid, appellee, was plaintiff in the court below; the railroad company, appellant, was defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court. The facts are stated in the opinion of the court.

*Mayes & Longstreet,* for appellant.

We have a number of cases in our own reports where this court has held that the jury was not warranted in inflicting punitive damages, in which the facts showing malice and oppression in much stronger terms than they are suggested in the case at bar, and we are unable to account for the action of the court in giving instruction No. 2 for the plaintiff.

In *Railroad Company v. Moore,* 79 Miss. 766, 31 South. 436, the passenger was ejected from the train and "the conductor's tone of voice was abrupt, his manner firm, positive and determined," and it was held that punitive damages were not allowable, although the railroad ticket agent had made a mistake in selling the ticket, which was the occasion of the ejection from the train. The conductor was held in that case free from fault in executing the orders of the company, and that his belligerent tone of voice was not sufficient to amount to the wilfulness, wantonness and oppression that warranted the infliction of punitive damages.

In *Vicksburg, etc., R. Co. v. Marlett,* 78 Miss. 872, 29 South. 62, a passenger was ejected through mistake of the servant of the company in failing to punch his transfer ticket, and in

that case the plaintiff said of the conductor's conduct, as Reid said here, and as testified in the case *supra*: "I considered him very insulting," the court said: "It was not for the plaintiff to determine whether he was insulting or not, but for the jury."

The court further held in that case, that the conductor did right in executing the order of his master in putting a man off the train under the circumstances; that the mistake was that of agent and not of the conductor.

In *Yazoo, etc., R. Co. v. Rodgers,* 80 Miss. 200, 31 South. 581, the agent, who sold the ticket, told Rodgers that the ticket would be good on any passenger train returning. On his return, he and others testified that he was on a train not scheduled to stop at Eggremont, and told the conductor that his wife was sick, as a reason for begging him to stop the train for him, and that the conductor replied "Damn your wife, I cannot take you." The court said: "The record discloses that Rodgers' ticket was not good on Howard's train, and that Howard was justified in refusing him passage on that train and that there was no ground in the evidence for the imposition of exemplary or punitive damages." See also *Cumberland T. & T. Co. v. Baker,* 85 Miss. 486, 37 South, 1012; *Illinois, etc., R. Co. v. Marlett,* 75 Miss. 956, 23 South. 583; *Illinois, etc. R. Co. v. Dorrah,* 65 Miss. 14, 3 South. 36; *Mitchell v. Southern R. Co.,* 77 Miss. 917, 27 South. 834. In the case at bar the plaintiff testified that he considered the conduct of the conductor "very discourteous," and when asked the reason why he considered him "discourteous" the plaintiff replied: "Because he would not let me have a word to say or would not listen to me."

The conductor is not shown to have uttered an impolite or improper word, or done anything in the world except to refuse to take the time from his business to argue a question with the passenger which so far as he was concerned would have been an utter waste of time, for he repeatedly informed the passenger that he had no power to stop that train.

*R. N. & H. B. Miller,* on same side.

The announcements in the case of *Railroad Co. v. Harper,* 83 Miss. 564, 35 South. 764, have no sort of application to the case at bar. In that case the lady who was travelling from Henderson, Kentucky, to Water Valley, Mississippi, wanted to go by a particular route. The company had two routes by which she could go and by the gross carelessness and misdirection of the several agents and conductors, she was put entirely out of her route, and was put off the train in the night time in a strange community, and suffered a great many delays and inconveniences, was made sick by the anxiety and worry she underwent, all the result, as above stated, of the gross carelessness of the conductors and agents of the company; and therefore the court properly held that such putting her off of the train "under the circumstances detailed in evidence at night" entitled her to punitive damages.

In the *Riley case,* 68 Miss. 769, 9 South. 443, the court held that the mistake of the conductor who tore off the wrong end of the return ticket and the fact that the passenger had this wrong end in his possession were sufficient to have informed the conductor of the truth of the passenger's claim as to the circumstances. This is all that was decided in that case. In other words, that there was enough of the ticket in the passenger's possession to corroborate the truth of his explanations of the conductor who put him off.

Neither of these cases have any bearing upon the case at bar; the question here is, was the conduct of the conductor here sufficient to make that wantoness and wilfullness which authorizes the infliction of punitive damages?

Let it be remembered that Reid's own evidence shows that he knew that train No. 3 was not scheduled to stop regularly at Magnolia, and therefore if it be true that the agent told him, when he bought the ticket, that it would stop for him, he was not thereby misled, because he knew that it did not regularly stop. He could not claim to have been misled by the ticket agent when he knew better.

The question of whether or not punitive damages may be inflicted, depends upon the facts of each particular case. In the case at bar Reid was compelled to get off one train and wait thirty minutes to get another train which took him safely home; he suffered no other loss under high Heaven than this delay of thirty minutes.

He cannot have punitive damages because the conductor refused to listen to his explanation, because he had nothing to explain. If the conductor had listened and told him that the agent was mistaken it wouldn't have altered the conductor's right to stop the train or his power under the rules and regulations of the company to do it.

The court will note that this case is to be easily differentiated from the case of *Gortikov v. Illinois, etc., R. Co.,* 90 Miss. 787, 45 South. 363. In that case the conductor for the company wilfully and without excuse repudiated the plain letter of the contract of carriage and refused to hear explanations in the face of the contract of carriage.

In this case, however, neither the conductor nor his company repudiated the contract and denied the passenger the right to ride but simply required him to take a different train which resulted in a delay of about thirty minutes. We call the court's attention to this difference, neither the case of *Harper v. Railroad Co.,* 83 Miss. 564, 35 South. 764, nor the *Gortikov case,* have therefore application to this case. This case is controlled by *Railroad v. Moore,* 79 Miss. 766, 31 South. 436, and *Vicksburg, etc., R. Co. v. Marlett,* 78 Miss. 872, 29 South. 62.

We submit that conceding that Reid had a contract to be carried to Magnolia, it was perfectly reasonable to require him to wait at McComb and take another train rather than to stop this interstate fast train which the record shows was then behind schedule time. Other people were on this train and had a right equal to that of Reid at least, and the little inconvenience of asking him to wait thirty minutes at McComb rather than in convenience everybody else on the train surely could not be made the basis of punitive damages.

The suggestion that Galvani, the trainmaster, was misrepresenting facts, when he disclaimed any power to stop that train, finds no sort of support in the record.

*Green & Green* and *R. W. Cutrer,* for appellee.

The case is fully covered by *Railroad Company v. Harper,* 83 Miss. 560, 35 South. 764. As said there, page 570, "It is idle to argue that the conductor, flatly refusing to listen to a perfectly reasonable explanation made by the woman, and putting her off, under the circumstances detailed in the evidence, at night, was not guilty of such intentional and oppressive wrong done as to warrant the imposition of punitive damages. It may as well be understood, once for all, that this court proposes to stand ·by the doctrine announced in the *Drummond* and *Riley cases,* as the just and true doctrine."

In *Railroad Co. v. Riley,* 68 Miss. 762, 765, 9 South. 443, it is said: "It is sufficient to say that where as here, the ticket in the hands of the passenger, supports and confirms the truth of his statement, and no possible injury can result to the carrier by the conductor's accepting and acting thereon, he must so act or refuse, at the peril of inviting an action for damages against his principal if the statement be true  *  *  *   And therefore than any regulation of the carrier authorizing the conductor of its trains to disregard such statement is unreasonable, ·and need not be submitted to by the passenger."

As said in the *Harper case,* page 569: "It was not only the duty of the conductor to listen to this most reasonable explanation, but, having heard it, as he did, it was wrong, a wilful wrong warranting the imposition of exemplary damages, to put ·the lady off the train under the circumstances. It is none the less a wilful wrong because he acted in a gentlemanly manner and was guilty of no insolent conduct. She was subjected to the most grievous wrong, and she was intentionally subjected ·to it after full disclosure of what had occurred between her and ·the ticket agent of the company."

It is a wilful wrong for a conductor to put a passenger off the train who holds a ticket for a particular point, and which the conductor claims does not stop at that point, to refuse to listen to the facts and circumstances showing that the passenger purchased the ticket for that train and for that point.

In the *Harper case* the testimony was that "he put me off against my will; just wilfully put me off. Of course he did not take me bodily and put me off, but he told me I had to do it, and of course I did it."

In that case it was held that punitive damages were proper under the facts stated, and we insist that this case is conclusive of the case at bar.

When a passenger holding a ticket for a particular place undertakes to explain to the conductor that that particular ticket was sold him for that particular train, and with the agreement that the train was to stop for him there, and the conductor wilfully refuses to listen and answer to his request for a hearing, "I have heard that before," this of itself is an imputation that the story of the passenger is false, and that it was intended to deceive, and that he was unworthy of belief.

The proof shows that No. 3 stopped at Magnolia for persons holding these tickets to get off and the brother and sister of Groce's wife got off at Magnolia on through tickets, and so too did Davis, Butler, Middleton, Moss and divers other persons all stopped on these through tickets to Magnolia, and if it was true that a special order was required to stop the train at Magnolia to allow through passengers to debark, it was the duty of the conductor to have listened to Reid (and not wilfully turned his back upon him) and to have obtained the special order. But notwithstanding the testimony about the special order, it is manifest from all of this testimony that on that class of tickets there was no special order required, and that if there had been a special order required that it was the duty of the conductor to have obtained the special order instead of wilfully refusing to do so.

It is pretended by Galvani, the train master, that he had no authority to stop the train to let Reid and family off at Magnolia, and this subterfuge is exploded by the evidence that he did have the authority and that he exercised it for Leggett.

WHITFIELD, C. J., delivered the opinion of the court.

The only question in this case is as to the right of the appellee to recover punitive damages. The judgment in the court below was for $438.91, manifestly a judgment for punitive damages. The case in brief is this: E. W. Reid, desiring to go with his wife and children from Magnolia, Miss., to the World's Fair at St. Louis, Mo., in September, 1904, went to the ticket agent at Magnolia to purchase a ticket to St. Louis and return—a special excursion ticket calling for continuous passage. The return portion of this ticket was to be signed by him before the agent of the railroad company in St. Louis, according to the custom in such cases. When he purchased the ticket from Groce, the ticket agent of the appellant at Magnolia, Groce asked him whether he wanted No 2—that is the fast train going north—to stop for him, and Reid told him he did, and Reid asked the ticket agent while purchasing the ticket, whether No. 3 would stop for him on his return trip, and the agent said in substance that it would. Reid's testimony, to be exact, is as follows: "When I bought the ticket, he [i. e. Groce] asked me if I wanted No. 2 to stop, and I told him that I did; and after I signed the ticket I said: 'No. 3 will stop for me coming back will it?' And he said, 'Yes.'" Reid further testifies that he always understood that No. 2, when going north, stopped for any passenger north of Grenada, Miss. Acting on the faith of this contract made with this ticket agent, Reid purchased a special excursion ticket and went with his family to St. Louis. When he got ready to come back, he says that he went to the ticket office at St. Louis, and signed his ticket in the presence of the agent, and bought his Pullman berths to Magnolia. He states that the ticket agent of the appellant company

at this uptown office asked him for his railroad ticket when he bought his berths, and directed him to sign the return portion of the ticket, which he did in the agent's presence, and the agent witnessed it and stamped it—all as customary in such cases. He further says that he told this ticket agent of the train he wished to use this ticket on, in order to get berths in the Pullman car on that train, he wished to use his ticket on No. 3, the fast train going south by Magnolia on the Illinois Central Railroad. He further testifies that in St. Louis he presented his tickets, railroad and Pullman, at the gate of the Union Depot, and the employee whose business it was to attend to that matter asked where the tickets took him to, and he told him Magnolia, Miss., and the employee opened the gate and he walked in, having shown the tickets to this gateman, and that this gateman let him enter and board No. 3. He further testifies that after he boarded the train the conductor took up his railroad tickets and his sleeping car tickets, as is usually done in such cases, and that he then, with his family, continued without interruption on his journey until he got near to McComb City, about seven miles north of Magnolia, his destination.

Up to this point it will be seen that every official of the appellant charged with the duty of selling the ticket in the first place, and of accepting and stamping and witnessing the return portion of the ticket in the second place, and the gateman on guard at the Union Depot in the third place, and the conductor on train No. 3 in the fourth place, each and all acted in strict conformity with the special contract made between the appellee and the ticket agent who sold him the excursion ticket at Magnolia. The appellee acted manifestly on the faith of this contract, and expected to be put off in accordance with it on his return. He then proceeds to say that when he got near to McComb City on his return the conductor came through the car and handed him something, and that he asked the conductor what it was, and the conductor said it was his ticket. He then says: "I asked him what I wanted with it, and he said, 'You

have got to get off at McComb City.' I told him I didn't think I did; that my ticket read to Magnolia. He said, 'I have heard that before,' and pitched the ticket in my lap and went on." He further states that the manner of the conductor was exceedingly discourteous; that he tried to tell him four or five times, and that the conductor refused absolutely and peremptorily to hear any explanation whatever; and that all this was witnessed by many other passengers. Further than this, it appears that Galvani, the trainmaster, was aboard the car, and Reid testified positively that he went to Galvani and appealed to him to get the train stopped, having been introduced to him by Thad Lampton; that he explained the facts and circumstances fully to Galvani, and told him that his ticket said take him to Magnolia, one continuous passage. He states that Galvani said that he (Galvina) did not have any authority in that line, and that he then asked him as a favor to him and to the ladies that were with him to have the train stopped at Magnolia and let them off, and that Galvani said that he did not have any authority in that line, and added, "anyway I [Galvani] would be afraid to do it on account of the trouble you are having down there." This trouble, it very clearly appears, grew out of an effort on the part of the citizens of Magnolia, prominent among whom were the Lamptons, to force the through trains to stop at Magnolia. Galvani positively denies that Reid was introduced to him, or that any such conversation occurred. Manifestly the jury believed Reid. Reid further testifies that about this time, in the summer of 1904, Davis went to St. Louis and came back on this No. 3, and that Butler did the same thing and that Middleton did the same thing, and that No. 3 stopped for all these gentlemen. On cross-examination Reid was pressed to say whether the conductor did not tell him that he could not stop the train unless he got an order from a higher official to stop, to which he answered: "No sir; he didn't say that. I don't know that he got an order or that he had to get an order."

Dr. Felder testifies that on his return from the World's Fair in 1904, on this same No. 3, it stopped for him to get off at Magnolia, and that this same trainmaster, Galvani, stopped it; himself giving the order to the conductor. On cross-examination it was attempted to show by this witness that the reason that Galvain stopped the train was that Felder's wife was suffering with a sick headache on that occasion, but Felder says this was not true, and that no such representation was made to Galvani. Galvani contradicts all this, too; but the jury accepted the statement of Felder. C. E. Davis testifies that on his return from the World's Fair in 1904, on the same kind of excursion ticket, the plaintiff had its train No. 3 stop for him at Magnolia. On cross-examination he says that the conductor did this on account of old acquaintanceship with the wife of the witness Davis, without any order of any kind. W. T. Butler testifies that on his return from the World's Fair in St. Louis in 1904, on exactly the same kind of excursion ticket the plaintiff had, this identical train No. 3 stopped for him at Magnolia, and that it was stopped without any request or order of any kind— stopped upon his simply telling the conductor that he wanted to get off at Magnolia. J. I. Middleton testifies that he returned from the World's Fair in the fall of 1904, and that the train was stopped for him to get off at Magnolia—this same No. 3— and that this was done twice in the fall of 1904. Willie Morse testifies that in the month of July, 1904, he got on this same train in St. Louis (No. 3); and, when asked on cross-examination whether he did not know that this train No. 3 never stopped at Magnolia except on special orders, said that he did not know about that—that he knew it stopped sometimes. West Elliott testifies, also, that he bought a ticket from New Orleans to Hot Springs at Magnolia, and went to the World's Fair in 1904, and that he came back on this same No. 3, and it stopped for him to get off at Magnolia, and that this was done on orders from a local attorney from Magnolia.

In addition to all this testimony, absolutely overwhelming,

on the proposition that this special train, No. 3, did stop at Magnolia, on various occasions in that identical year and summer, and let passengers from the World's Fair, and other passengers, get off at Magnolia without any special order, and abundantly showing that Galvani had himself ordered this train stopped, in other cases than emergency cases, without any special order except his own order, the plaintiff introduced rule No. 403, of the appellant company, which is as follows: "Train Masters. 403. They will direct the movement of trains, make requisitions for coaches and regulate the runs of the crews." This rule manifestly, authorized the train master to stop the train at Magnolia; there being nothing in the record to show to the contrary. The testimony of Galvani is in flat conflict with the testimony of other witnesses in the case with respect to what he did on various occasions, and with regard to his power to order the train stopped at Magnolia. The jury were certainly warranted if they saw proper, in accepting the testimony of the other witnesses.

W. B. Groce, the ticket agent, and a witness for the defendant, testifies that Reid asked him if No. 3 would stop for him on his return, and that he told Reid that he did not suppose that he (Reid) would experience any trouble in getting it to stop; that it had stopped for other people on similar occasions. This is the positive testimony of the railroad ticket agent himself. Surely the jury were warranted in believing that this special contract was made, and that Reid boarded the train on the faith of this contract and this representation made by the ticket agent. Further than this Groce says, in answer to a question as to what he meant by other persons getting off on similar occasions, that he meant that the train generally stopped to let off Chicago and St. Louis passengers; that he did not know how often they had done this; that sometimes it would be once or twice a week; and this, too, was the positive testimony of a witness introduced by the railroad company, and that witness the ticket agent himself. How it is possible for the railroad company to contend, in the

face of this testimony of its own ticket agent, that this special contract was not made, and that Reid did not board this train on the faith of this representation and special contract, it is certainly difficult to understand. Galvani in his testimony actually testifies that he did not remember anything about Reid's being introduced to him by Thad Lampton at all, nor about Reid's having any conversation whatever with him in respect to stopping train No. 3. Thad Lampton, in rebuttal, testified that he not only introduced Reid to Galvani on this train, but that he explained to Galvani that he (Reid) was associated with them (the Lamptons) and had charge of their business in Magnolia, and that Ed. Harlan, an engineer of the railroad, living at McComb City, was with them when this occurred. Harlan was not introduced by the railroad company to contradict Lampton. . . .

This is the case made by the testimony, except that there is a good deal of testimony, the object of which was to show that there was trouble and bad feeling between the Lamptons and the appellant company in respect to stopping this through train at Magnolia; that there had been litigation about this, and a contest before the state railroad commission, etc. We say nothing as to all this. It seems to us to be utterly immaterial, in any view, for the proper decision of this cause. The question here is, not what state of feeling might exist between the Lamptons and the railroad company, but whether, in this particular case, the conduct of the conductor of this appellant company in this case, as made by all the testimony which we have hereinbefore set out, was wilful and wanton. It must be too clear for any further comment that the jury were abundantly warranted in believing that the special contract was made between Groce and Reid; that the ticket agent did agree with Reid that No. 3 should stop for him on his return; that Reid acted on the faith of this special contract and the faith of this representation of this duly constituted ticket agent; and that every official of this appellant company connected with his transportation, whether in Mag-

nolia or in St. Louis, one and all, conformed to this contract thus made until the conductor came along at McComb City. Now the precise point, therefore, on which the defendant must stand, if it can stand at all, is that this conductor, Grant Lord, was not guilty of wilful or wanton conduct in the expulsion of the appellee and his wife and children from this train; and the basis of all this reasoning is precisely the reasoning that has been three times discarded and repudiated by this court, to-wit, that the conductor is not bound to listen to any explanation, and that he must go by the face of the ticket which is shown him, and that he is not required to listen to any statement setting forth special arrangements or special representations made by the duly authorized ticket agent at the time of the making of the special contract; and this is said to be because the conductor is bound by a rule of the company to act in this way, and to be governed, exclusively, by the face of a mere ticket, which may or may not be the whole contract.

We thought we had disposed of this with sufficient clearness and sufficient emphasis in *Railroad Co. v. Harper*, 83 Miss. 560, 35 South. 764. At page 570 of 83 Miss., page 767 of 35 South., we said: "It is idle to argue that the conductor, flatly refusing to listen to a perfectly reasonable explanation made by the woman, and putting her off, under the circumstances detailed in the evidence, at night, was not guilty of such intentional and oppressive wrong done as to warrant the imposition of punitive damages. It may as well be understood, once for all, that this court proposes to stand by the doctrine announced in the *Drummond* and *Riley* cases as the just and true doctrine." We quoted in that case from the opinion of Mr. Justice Lamar in *New York, etc., R. Co. v. Winter's Administrator*, 143 U. S., at page 69 *et seq.*, 12 Sup. Ct. at page 359, 36 L. Ed. 71, the following passage, which we again repeat, in the earnest hope that we may not be called upon to state it a third time: "The grounds upon which it is insisted that the evidence referred to was inadmissible are that the ticket itself, and the

rules and regulations of the road with respect to stop-over checks, constitute the contract between the passenger and the road, and the only evidence of such contract, and that no representations made by a ticket seller could be received to vary or change the terms of such contract. This contention cannot be sustained, and is opposed to the authorities upon the subject. While it may be admitted, as a general rule, that the contract between the passenger and the railroad company is made up of the ticket which he purchases, and the rules and regulations of the road, yet it does not follow that parol evidence of what was said between the passenger and the ticket agent from whom he purchased his ticket, at the time of such purchase, is inadmissible, as going to make up the contract of carriage, and forming a part of it. In the first place, passengers on railroad trains are not presumed to know the rules and regulations which are made for the guidance of conductors and other employees of railroad companies as to the internal affairs of the company, nor are they required to know them. *Hufford v. Grand Rapids, etc., R. Co.,* 64 Mich. 631, 31 N. W. 544, 8 Am. St. Rep. 859. In this case there is no evidence, as already stated, that notice or knowledge of the existence of the rules of the defendant company, or what they were, with respect to stop-over privileges, was brought home to the plaintiff at the time he purchased his ticket, or at any time thereafter. There was nothing on the face of the ticket to show that a stop-over check was required of the passenger as a condition precedent to his resuming his journey from Olean to Salamanca after stopping off at the former place. It is shown by the evidence that Olean was a station at which stop-over privileges were allowed. Under such circumstances, it was entirely proper for the passengers to make inquiries of the ticket agent, and to rely upon what the latter told him with respect to his stopping over at Olean. *Hufford v. Grand Rapids & I. R. Co., supra; Palmer v. Charlotte, C. & A. R. Co.,* 3 S. C. 580, 16 Am. Rep. 750; *Burnham v. Grand Trunk R. Co.,* 63 Me. 299, 18 Am. Rep. 220; *Murdock v. Bos-*

*lon & A. R. Co.,* 137 Mass. 293, 50 Am. Rep. 307; *Arnold v. Pennsylvania R. Co.,* 115 Pa. 136, 8 Atl. 213, 2 Am. St. Rep. 542."

We expressly held in the *Harper case* that, if the company had any such rule, as here contended for, that the conductor must be governed by the face of the mere ticket alone, which may be but a part of the contract, then such regulation, not known to the passenger, is unreasonable and void, and we reiterate again that declaration. What was the doctrine of the *Riley case,* 68 Miss. 765, 9 South. 443, 13 L. R. A. 38, 24 Am. St. Rep. 309, and the *Drummond case,* 73 Miss. 819, 20 South. 7, just referred to? This, as set forth at page 770 of 68 Miss., page 444 of 9 South. (13 L. R. A. 38, 24 Am. St. Rep. 309): "The decisions are in direct and palpable conflict upon the liability of a common carrier for failure to transport a passenger under the circumstances named. In New York, Michigan, Illinois, Maryland, Ohio, Wisconsin, Connecticut, New Jersey, Massachusetts, and North Carolina it seems to have been decided that the ticket presented by the passenger is the only evidence of his right to travel upon the train which can be recognized by the conductor, and that if, by reason of the negligence of other servants of the carrier, a wrong ticket has been given to the passenger, or the right ticket has been given to him, but erroneously taken from him, the passenger's right of action is for the wrong thus committed, and that he may not insist upon his right to travel on the wrong ticket or without it, when it has been taken up, and recover damages for the refusal of the carrier to permit him to do so, and that the carrier may lawfully eject him from its train, using no more force than is necessary for that purpose. On the other hand, it is held in Georgia and Indiana that the passenger is entitled to travel according to his real contract with the carrier, where the mistake in giving the proper ticket or in taking up a proper one held by the passenger is caused by the negligence of the servants of the carrier. *Railroad Co. v. Fix,* 88 Ind. 381, 45 Am. Rep. 464."

The court proceeded through Justice Cooper to comment and call attention to the fact that Michigan had practically over-ruled its former cases, and held with Georgia and Indiana, as shown by the case of *Hufford v. Railroad Co.,* 64 Mich. 634, 31 N. W. 544, 8 Am. St. Rep. 859, in which case an instruction was held to be erroneous which told the jury that if a ticket had been punched, indicating to the conductor by the punch mark that it had been used before, that would be evidence of infirmity in the ticket, and the plaintiff could not insist upon the ticket's being received. The Michigan supreme court said that instruction was erroneous, observing that: "When the plaintiff told the conductor on the train that he had paid his fare, and stated the amount he had paid to the agent, who gave him the ticket he presented and told him it was good, it was the duty of the conductor to accept the statement of the plaintiff until he found out it was not true, no matter what the ticket contained in words, figures, or other marks." The court then referred to Hutchinson on Carriers, § 571, and the authorities cited in note 2, and in concluding the court said: "Where, as here, the ticket in the hands of the passenger supports and confirms the truth of his statement, and no possible injury can result to the carrier by the conductor's accepting and acting thereon, he must so act, or refuse, at the peril of inviting an action for damages against his principal if the statement be true. A passenger, holding and attempting to use such ticket under the circumstances disclosed in this record, and explaining to the conductor how the mistake occurred by which the ticket read in the wrong direction, makes such a reasonable and probable showing as entitles him to be dealt with as a passenger, and therefore any regulation of the carrier authorizing the conductor of its trains to disregard such statement is unreasonable, and need not be submitted to by the passenger." Note specially this last clause. In short, the *Riley case* aligned this court, practically, with the Indiana and Georgia courts.

The only cases relied on by the learned counsel for the appel-

lant are *Railroad Co. v. Moore,* 79 Miss. 766, 31 South. 436, and *Vicksburg R.; etc., Co. v. Marlett,* 78 Miss. 872, 29 South. 62. A close examination of these cases will show that they have no sort of application to the case in hand. In the *Marlett case* it appears from the opinion that no explanation was made or offered to be made to Conductor Dyer, who put Marlett off, of the fact that the previous conductor had failed to punch the ticket as the rule required. In the *Moore case* the ticket had expired, as shown on its face, and in addition to this the ticket was unstamped. In other words, all the circumstances tended to contradict the proffered explanation of Moore as to how the mistake was made by the ticket agent at Oxford. In other words, the circumstances, instead of supporting the explanation, contradicted the explanation. That was the turning point of that case, and that fact was fully appreciated by the eminent counsel for the appellant in that case, who say in their brief, at page 770 of 79 Miss., page 436 of 31 South., as follows: "In the case at bar there is not one circumstance which tends in any way to corroborate the statement of the plaintiff. In fact, everything contradicted his statement. The ticket on its face had expired, and in addition to that it was unstamped—nothing to show that it came from the railroad office in a lawful way, or when. There was no exhibition of a check, as in the *Holmes case,* 75 Miss. 371, 23 South. 187, and no exhibition of the stamp coupons, as in the *Riley case.*" Obviously, neither of these cases sheds any light on the point involved in this case. As stated at the outset, this case is controlled perfectly by the *Harper case,* the *Riley case,* and the *Drummond case.* In the *Drummond case,* 73 Miss. 818, 819, 20 South, 7, it is expressly stated by the court that "appellee made no explanation to the conductor of the circumstances connected with the purchase of the ticket or of the manner in which he received from the ticket agent the ticket he had not applied for.' He only says he protested against his being required to occupy a seat in the second-class coach." In other words, the *Drummond case,* in this re-

spect, is exactly like the *Marlett case*. But the court further held in the *Drummond case,* at page 819 of 73 Miss., page 7 of 20 South., that the passenger's ticket is not, in all cases, con- clusive evidence of his contract with the carrier, yet that it is sufficient evidence to justify a conductor in acting upon it, as showing the actual contract, in the absence of any reasonable statements made to him by the passenger that through fraud, mistake, or inadvertence it (the ticket) does not show the real contract. In other words, the court held, squarely and prop- erly, that it is always competent to show, by reasonable explana- tions made to the conductor, that the ticket, through fraud, mis- take, or inadvertence, does not set out the real contract.

We think the jury were well warranted in believing from the testimony in this case that Galvani had full power to stop this train without any higher authority, both from the testimony of the witnesses and from the rule No. 403; that this conductor should have listened to the explanation offered to be made by Reid, and having heard it, should have stopped the train for the appellee according to the special contract. Instead of do- ing this, he pitches the ticket back in the lap of the appellee, tells him, "I have heard that before," the insultingly sinister implication involved in which is too obvious for comment, and wilfully and wantonly and peremptorily refused to hear any explanation whatever. This is the wilfulness, this is the wan- tonness—the refusal to hear any explanation whatever—which authorized the court to give the instruction regarding punitive damages.

We think the action of the court below was entirely correct in giving the instruction, and the judgment is *affirmed.*

MAYES, J., delivered the following dissenting opinion.

I do not think the facts warrant the allowance of exemplary damages, and for that reason dissent from the conclusion of the majority.