Yazoo & Mississippi Valley Railroad Co. *v.* Mrs. W. H. Hardie.

[55 South. 42, 967.]

1. **Carriers.** *Passengers. Breach of contract. Punitive damages. Review. Parties entitled to allege error.*

In determining the question of a passenger's right to recover punitive damages for being carried beyond her destination the physical condition of the passenger at the time, the purpose of her journey and that she intended to go to a hospital, the condition of the weather and the fact that her ill health was aggravated by getting wet, are immaterial. These facts may be material on a question of actual damages or as matters of aggravation, if the right to punitive damages is established.

2. **Carriers.** *Breach of contract. Passengers. Punitive damages.*

A railroad is not liable for punitive damages for a mere failure to perform its contractual duties, and a passenger is not entitled to recover punitive damages for failure of the carrier to notify her of arrival at her destination, and for refusal to back the train on discovering that she had been carried past her destination, where there was no intentional injury, hardship, impoliteness or rudeness.

3. **Same.**

A carrier which has violated its duty can be assessed with punitive damages only when there has been some intentional wrong, insult or abuse, or where there has been such gross neglect of duty as to evince reckless indifference to the rights of others.

4. **Appeal and Error.** *Review. Parties entitled to claim error:*

Where a suit was brought jointly against a railroad company and a Pullman Company, for carrying a passenger beyond her destination and refusing to back the train to her destination, the railroad company cannot complain of error in directing a verdict for the Pullman Company, and dismissing the suit as to it.

5. **Same.**

In such case both companies may be liable for negligence, either jointly or severally, but neither is in any position to complain that the other is not sued, or that being jointly sued the plaintiff dismissed as to one.

6. DAMAGES. *Punitive. Compensatory.*

> Compensation is the general rule in assessing damages, exemplary or punitive damages is additional to compensatory damages, and such damages are only allowed for the public benefit. Punitive damages are never allowed for the purpose of enriching the injured party.

7. DUTY OF CARRIER. *Passengers. Code* 1906, *section* 4047.

> A carrier having carried a passenger beyond her distination is not required to back the train at her demand, especially in view of Code 1906, section 4047, requiring a railroad company, when backing a train of cars along a passenger depot, to be proceeded by a servant not exceeding forty or under twenty feet in advance of it, thereby recognizing the danger of backing the train.

APPEAL from the circuit court of Caohoma county.

HON. SAM. C. COOK, Judge.

Suit by Mrs. W. Hardie against the Yazoo & Mississippi Valley Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Mayes & Longino,* for appellant.

*J. W. Cutrer* and *Brewer & Watkins,* for appellee.

The record in this case being lost the reporter is unable to give the briefs of counsel.

MAYES, C. J., delivered the opinion of the court.

On this record the only question we are required to determine is whether or not the trial court should have instructed the jury that they might assess punitive damages. If the facts did not warrant the submission of this question to the jury, the case must be reversed, as it is manifest that the jury awarded more than actual damage. Should the trial court have authorized the jury to consider the question of punitive damages? Since this is the only question which we are required to determine at this time, all testimony relating to the physical condition of Mrs. Hardie at the date she was carried beyond

her stop is unimportant. It is equally unimportant to consider the testimony as to what her purposes were in going from Clarksdale to Arcola, and that she was in an impaired state of health, and intended to go to a hospital in Greenville, after staying a few days at the home of a friend near Arcola. We may leave out of view the condition of the weather at the time the train from Clarksdale arrived at Arcola at 3:25 p. m. It is equally unimportant to consider the fact that by being carried by her station to Rolling Fork, and after her return to Arcola at 6 o'clock p. m., she got off her train at Arcola in the rain, and her condition of ill health was aggravated by getting wet. These facts may be material on a question of actual damage. Such facts may also be material as matters of aggravation, if the facts in the record made a case for the assessment of punitive damages. But as stated above the sole question in this case is whether or not it was proper for the court to instruct the jury that they might assess punitive damages. In the consideration of this question, all circumstances which might aggravate the damage must be placed out of view until the question of whether punitive damages can be assessed at all is determined.

The facts are wanting in every element which would warrant the court in instructing the jury that punitive damages might be assessed. A railroad company is not liable for punitive damages for a mere failure to perform its contractual duty. This is expressly held in the case of *Railroad Company* v. *Scurr*, 59 Miss. 456, 42 Am. Rep. 373, and in many cases cited in the reprint of this case to be found in book 29, page 189, Reprint of Mississippi Reports. A railroad company which has violated its duty can be assessed with punitive damages only where there has been some intentional wrong, insult, abuse, harshness, or where there has been such gross neglect of duty as to evince reckless indifference of the rights of others. This has been the consistent holding of this

court in all cases which have been brought to it where this question was involved. In this case there is no evidence evincing any intentional wrong, insult, abuse, harshness, or gross neglect of duty evincing indifference to the right of the appellee. Hrs. Hardie boarded the train at Clarksdale for Arcola. She provided herself with a ticket which entitled her to passage on the train, and on entering same, instead of going into the day coach, she went into the Pullman for the purpose of obtaining the more desirable accommodation afforded by it. When she entered the Pullman car, she paid the additional fare, and it became the duty of both the Pullman Company and the railroad company to notify her when she reached her destination, and to assist her to safely get off the cars at that point. The train reached her destination at 3:25 in the afternoon, but no employee of either company notified her that she had reached her destination, nor was any attempt made to notify her while the train stopped at her station; but there is no evidence in the record from which it may be inferred that this failure of duty on the part of the two companies was the result of anything more than mere neglect. There is no evidence tending to prove that the failure of the two companies to discharge their duty was intentional, or the result of a reckless disregard of the rights of Mrs. Hardie.

Shortly after the train started from Arcola, the station at which Mrs. Hardie should have gotten off, she discovered that she had passed her station and undertook to have the porter stop the train, and a few minutes afterwards appealed to the conductor, demanding that he stop the train and take her back to Arcola. At this time the train had gone some hundred yards or more from the station at Arcola and was under full headway. The testimony shows that the conductor was polite and courteous, and that the employees of both the railroad and sleeping car company were courteous and polite; but

the conductor refused to stop the train and have it backed
to Arcola for the purpose of allowing Mrs. Hardie to
debark. The proof shows that the conductor declined to
do this, not because of any intent on his part to disre-
gard the rights of of Mrs. Hardie, not because of any
intention to inflict any intentional injury or cause her
trouble, but because, in good faith, he believed that her
request was impracticable, and that the train had pro-
ceeded too far for him to do as requested. There was no
harshness, no impoliteness, no rudeness, no intentional
injury, unless it can be said that the mere fact that the
conductor would not comply with the request of appellee
constituted an intentional wrong or gross neglect of duty.
This we cannot say. Mrs. Hardie was carried beyond
her station to Rolling Fork, and returned safely to Ar-
cola about 6 o'clock in the afternoon, without cost. She
does not complain of any lack of courtesy on the part
of the employees to her. It may be that it was the duty
of the conductor to stop the train and carry Mrs. Hardie
back to her station. As to what the duties of the con-
ductor were we are not called upon to decide. If it be
conceded that it was his duty to back up to the station
and let Mrs. Hardie off, a mere failure to observe that
duty would no more justify awarding punitive damages
than would the failure to put her off at the station in
the first instance, if no intentional wrong, rudeness, or
harshness characterized a refusal to stop and back up,
when the conductor was acting in good faith and in the
honest belief that his duty required him to go on to the
next station.

It is evident the company is liable for whatever actual
damage Mrs. Hardie may have sustained by reason of
the failure to perform its duty, but there is no liability
for punitive damages. We are unable to distinguish this
case from the case of *Miss. & Tenn. R. R. Co.* v. *Gill*, 66
Miss. 39, 5 South. 393.

                                                *Reversed and remanded.*

After the delivery of the above opinion counsel for appellee filed an elaborate suggestion of error.

MAYES, C. J., delivered the opinion of the court in response to the suggestion of error.

On the 12th day of March, 1909, Mrs. Hardie became a passenger on the line of railway owned by appellant. She boarded a regular passenger train at Clarksdale, bound for Arcola. The train on which she was traveling was due to arrive at Arcola at 3:25 p. m. and did arrive at that time, but on account of the negligence of the employees of the train Mrs. Hardie was carried beyond Arcola to Rolling Fork, and returned on the next train without expense to herself, reaching Arcola about 6 p. m. Omitting in this preface to state the circumstances of aggravation relied on as constituting the basis for the assessment of punitive damages, it is sufficient to state that she suffered a delay of about two hours and thirty-five minutes. She brought suit against appellant, alleging, among other things, that as soon as it was discovered that she had been negligently carried by her station, the porter of the car seized the bell cord, and caused the train to stop about a quarter of a mile below the depot, whereupon she demanded that her train be backed to the station and she be allowed to get off, and the declaration alleges that this the employees "willfully, maliciously, oppressively, and arbitrarily declined to do." She recovered a judgment against appellant for five thousand dollars, and from this judgment an appeal was prosecuted and the cause reversed, and this court, after mature consideration of the whole case, was of the opinion that no view of the case warranted the trial court in authorizing the jury to impose punitive damage. This case is again before us on suggestion of error, filed by counsel for appellee, to the original opinion. Before discussing the case in detail, a few general observations may not be amiss.

Some of the questions now pressed for decision, while in the case on its first hearing, were deemed not essential to decision, and we did not decide them. We shall do so now. When we held that the facts made no case for punitive damage, the questions now discussed were necessarily decided adverse to counsel for appellee.

It appears that when Mrs. Hardie took passage on the train, she went into a Pullman car attached to same, and became a passenger on that. The suit was begun originally against both the Yazoo & Mississippi Valley Railroad Company and the Pullman Company. When all testimony had been taken a motion was made by the Pullman Company to peremptorily instruct the jury in its favor. The court granted the instruction, and dismissed the suit as to the Pullman Company. It is insisted by appellants that this was reversible error. We cannot assent to this. Both companies may be liable for the negligence either jointly or separately, but neither is in any position to complain that the other is not sued, or that being jointly sued the plaintiff dismisses as to one. If the trial court was in error as to the peremptory instruction given to the Pullman Company, dismissing the suit as to it, the railroad company is in no position to complain because it neither adds to nor lessens its liability to plaintiff. *Nelson* v. *I. C. R. R. Co.*, 53 South. 619.

Another general observation we desire to make is that the declaration filed mainly relies for the right to impose punitive damages upon a supposed duty that the railroad owes a passenger to back the train to the station where it negligently failed to put the passenger off, when it is discovered that such passenger has been negligently carried by. This supposed duty we shall discuss further on in this opinion. The purpose in mentioning it now being to call attention to the fact that the declaration is based on the above idea.

Counsel filing the suggestion of error seemed deeply impressed with the belief that this court has committed

grave error in reversing this case. So deeply convicted are counsel that the court has erred that they open the argument with a moral lecture to the court, impressing the court with the grave responsibility which rests upon it in passing upon the rights committed to its care, and admonish us that when the court falls short of this duty a public calamity is visited upon the state. Counsel then say that "the bar shorn of the proclivities of the advocate know when the court is right, and when it has gone too far." We are then told that the suggestion of error was not final until the record and briefs had been submitted to able and disinterested members of the bar, and that the members of the bar to whom had been submitted counsel's case are of the opinion that the former decision of the court was error. After counsel has thus lectured us on our responsible duties, and concluded us from differing with them as nearly as it was possible to do, by the admonitions and estoppels previously pleaded against the judgment of the court, we are told that there is error of fact and law in the former decision. As additional proof of the error of the court, counsel state that no one can really know a case, as to its vital facts, as well as he who propounds the questions. Certainly, say counsel, "an over-worked court" cannot know the facts as the advocate who built them up. Induced by the above statements of counsel, and waiving all questions as to its propriety, we feel that it will not be out of place to say to them that this court never loses sight of the responsible duties that devolve upon it. We were fully conscious of all these things when the case was originally considered and decided. Our own sensitiveness to our judicial duty and responsibility is quite as impressive as any lecture which might be given on that subject by the advocate of either side. Counsel's own confidence in their position blinds them to the other side and causes them to forget that opposed to their views are able and distinguished members of the bar who ap-

pealed because they believed the trial court had erred in
its declaration of the law.  We shall presume that counsel
appealing this case, being conscientious and intelligent
members of the bar and officers of the court, appealed
in good faith.  It is therefore logically apparent that the
case must be tried on its merits, and cannot be safely
rested on certificates.  This court may sometimes err,
for no human tribunal can always be accurate, but it is
not unusual for counsel who lost their cases to conclude
that they lost because the court did not understand it,
or because the court did not give it sufficient considera-
tion, when in truth it is the partizan zeal of counsel that
shuts from their view all but their side of the case, and
the impressions they get from considering only that side.
We desire that our decisions shall be in harmony with
the ideas of the law entertained by the bar, for the view
of the bar, as such, is more than apt to be correct.  But
the bar is composed of more than a few, and we doubt
not but that the able and conscientious attorneys, willing
to certify that it was their judgment that the court erred
in its former decision, would, on reflection and more
careful study, withdraw that certificate and adopt the
view of the court.  Who can know a record and its mer-
its better than the court that has studied it in the quiet
of its office; guided by no purpose save to search for the
truth and to administer justice between man and man?
Is it possible that the advocate, interested on one side
of the case only, can get a better and more impartial
view of its merits than a dispassionate and disinterested
court?  In considering this case originally we gave it
careful thought.  We did not discuss it at length because
the judgment seemed to us to be so manifestly erroneous
and the case itself one of no complexity.   The facts
plainly made no case for the imposition of punitive dam-
age.  A careful review of the case makes us see no reason
to change our decision.  Out of deference to the manifest
conviction of the error of the court on the part of the

learned and distinguished counsel, we set out our views more at length.

What is the case? Until the controversy is understood there can be no intelligent comprehension of the rules of law that control it. Counsel for appellee convince themselves that the court has erred, both as to the facts and the law, and they convince the court that the predicate of their suit, as made by both the declaration and the proof, is one on which punitive damage could rarely, if ever, be allowed as against a carrier, and certainly not under the facts of this case. Counsel convince the court that they have misconceived the true principle of law controlling the decisions which they cite, and attempt to apply these authorities to the facts of a case wholly outside of the principles declared by the decisions. The only question in this case, is as to whether or not the trial court should have told the jury they were warranted in assessing punitive damage. Counsel filing the suggestion of error state that the original opinion misconceived the facts. We shall discuss this statement of counsel further on in the opinion; suffice it here to say that counsel give much importance to facts which have no bearing on the question before the court. In so far as the facts are material to the question involved, we set them out below.

As to some of the facts there can be no controversy. Appellee's proofs show that Mrs. Hardie became a passenger on the Yazoo & Mississippi Valley Railroad, paying for passage from Clarksdale to Arcola. When she boarded the train at Clarksdale there was a Pullman car attached, and in order to take advantage of the additional comforts of the Pullman she went into it, paying all fares. Mrs. Hardie was a delicate woman, and had been visiting her sister, Mrs. Davis, at Clarksdale. Her purpose is going to Arcola was to arrange for the leaving of her child with a friend, Mrs. Harriston, in contemplation of a possible necessity for her to go to a hospital

in Greenville to have some kind of an operation performed. While she was delicate, it does not appear from the testimony that she was in such state of invalidism as to make her an object of special solicitude to the employees of the train. She was traveling alone, was able to sit in the seat of the car and talk to other passengers, and she had with her a little child sixteen months old. She had a suit case and a parasol, and, so far as all outward appearances indicate, she was well enough to make the journey. When the conductor collected her ticket he was notified that she wished to get off at Arcola and requested to have the porter help her there. She also gave the same notice to the porter of the Pullman, and possibly the conductor of the same car. Mrs. Hardie lived three miles from Arcola, at Trail Lake Plantation, and had resided there previously for three years. On one or two occasions she had been to Arcola attending a ball game, but it seems she had never been to Arcola on the train before, and states that she was unfamiliar with the approach to, and surroundings about, the depot, and did not know when the train reached there. As the train came into Arcola the station was not called, and she was not notified in any way; in short this duty on the part of the employees was wholly neglected. As the train pulled into Arcola, Mrs. Hardie was engaged in conversation with a lady, and was not conscious of the fact that the train had reached there. She was not aware of the fact that she had reached Arcola until the Pullman porter rushed into the car, calling out to her, "Madam, this is your station." At the time the porter did this, it seems that the conductor of the Pullman was asleep, and did not wake up until after or about the time the porter gave the stop signal. About the time the porter called out, "This is your station," Mrs. Hardie states that the train began to move on its way to the next station. She states that as the porter called out to her, she jumped up from her seat, taking her child by one hand, her grip and par-

asol in the other, and started for the vestibule, request-
ing the porter to pull the stop signal, which she says he
did. Neither the train nor Pullman conductor were pres-
ent at this time, and the train was then moving from the
station. In a very few minutes the Pullman conductor
was aroused from his slumbers, and came in the vesti-
bule where Mrs. Hardie was, and she says that about that
time the train conductor also came. All this time, how-
ever, the train continued to move toward the next sta-
tion. Mrs. Hardie states that when the train had pro-
ceeded about as far as the oil mill, which her husband
states is about two hundred and fifty yards from the de-
pot, it slowed up so she could have gotten off if she had
been a man and had been free of the suit case and child.
In other words, she said that it was "creeping along."
When the train conductor came, Mrs. Hardie testifies
that she demanded that he back the train to Arcola and
let her off. When she made this demand, she says she
told the train conductor that she had to go into the coun-
try, and was not well; that she had a little baby with her,
and pleaded with him to back the train, but he would not.
She says the conductor told her he could not back the
train, but stated that he would carry her to Rolling Fork
and return her to Arcola on the next train without cost,
and this he did.

From the testimony of Mrs. Hardie it thus appears
that the train had then left the station and was on its
journey to the next station, else there would have been
no occasion on her part to demand that her train be
backed. Mr. Hardie testifies that he was at the depot to
meet his wife, and when the train arrived, supposing her
to be in the ladies' coach, he went there in search of
her. When about half way through the coach, he says,
the train started, having stopped for only a few seconds.
He says he then realized that his wife was not in that
coach, and concluded that she had taken the Pullman in
the rear of the ladies' coach. When Hardie got off the

train after failing to find Mrs. Hardie, he remarked to
Mr. Harriston, the friend to whose house his wife in-
tended to go, that he supposed his wife had not come,
whereupon Mr. Harriston told him that she had been car-
ried by; that he saw her on the train. After the train
pulled out Mr. Hardie testifies that he heard a stop signal
given. Thinking the train would stop and put his wife
off, he ran down the track behind the train, but the train
continued and did not stop, although it slowed up about
one hundred and fifty yards from the depot. He then
went to the agent and had him telegraph ahead to Hol-
landale, the next station, asking that his wife be put off
there. In a short while the agent received a reply saying
that Mrs. Hardie would be carried to Rolling Fork and
returned on the next train. Mr. Harriston testifies that
while Mr. Hardie was on the train, and just as the flag-
man gave the signal to start, he saw the Pullman porter
give some kind of a signal to the flagman, indicating that
there was somebody on the train to get off, and Mr. Har-
riston says that he called to the flagman that there was a
lady on the train to get off. Mr. Harriston testifies that,
notwithstanding the above signals, a move-on signal was
given, and the train left for the next station. It appears
from the facts, beyond dispute, that the train stopped at
Arcola for a minute and a half, and several passengers
got off. Mrs. Hardie was carried beyond Hollandale to
Rolling Fork in order to make better provision for her
comfort and convenience, and the facts show that it was
with her acquiescence after she found that she could not
have the train backed so she could get off at Arcola. She
was returned on the next train without cost, and every
courtesy was shown her by the employees of the railroad
company. It may be conceded that if the employees had
not neglected their duty, Mrs. Hardie would have reached
the home of her friend, who lived about a mile from the
depot, before dark and without getting wet. On account
of being carried by, she had to get off at Rolling Fork

in the rain, and when she returned to Arcola it was still raining, and she went from the station to Mrs. Harriston's, her ultimate destination, in a rain storm, and she and the child both got wet, and it is testified to that both were made sick on account of same. In so far as it can be contended that the facts might warrant the assessment of punitive damage, we think the foregoing constitute all that is shown. That the appellant is liable, under the facts of this case, for all actual damage, was settled by the first decision, and need not be again discussed here. We desire to notice that the train had stopped for a minute and a half at the station at a proper place for the discharge of passengers, and several passengers got on and off. When the demand to back was made the train was on its way to the next stop. In the record, it is shown by the declaration, the proof, and the instructions that counsel for appellee recognize that the failure of the employees to call out the station and to help Mrs. Hardie off the train was but an act of simple negligence, and was neither willful, wanton, or gross neglect warranting the imposition of punitive damage. On this case, in order to decide the question presented, we may place out of view all that occurred prior to the time the train started from Arcola, since what happened prior to that time only warranted the recovery of compensatory damage by the tacit admission of appellee. In considering the record we leave out of view the testimony of every one save the witnesses for appellee. In the original decision this was what the court did. It can make no difference in the decision of this case whether the train was under full headway or not at the time the train conductor reached Mrs. Hardie. It is certain that it had stopped at the station and was then on its journey to the next. When the train conductor first reached Mrs. Hardie she says the train was moving so fast that she could not have gotten off.

In considering what damage should be recovered for a wrong, let us keep well in view the general object of the law in allowing recoveries of this kind. Compensation is the general rule, though under special circumstances exemplary or punitive damage may be recovered. Exemplary or punitive damage is additional to compensatory damage, and such damage is only allowed for the public benefit. Punitive damage is never allowed for the purpose of enriching the injured party. Compensation is afforded him and that is all he can justly seek for any individual grievance. If the law considered only the individual no punitive damage would be allowed. The theory of the law authorizing the imposition of punitive damage is wholly outside of individual consideration. Such damage is allowed for the public good, and for the purpose of deterring others from like offenses.

Such damage is allowed in cases of malice, willfulness, insult, fraud, oppression, gross negligence, and the like. *Railroad* v. *Scurr,* 59 Miss. 456. 42 Am. Rep. 373; *Railroad Co.* v. *Jarrett,* 59 Miss. 470; *Forsee* v. *A. G. S. R. R. Co.,* 63 Miss. 66, 56 Am. Rep. 801; *Wilson* v. *N. O. & N. E. R. R. Co.,* 63 Miss. 352; *V. & M. R. R. Co.* v. *Scanlan,* 63 Miss. 413; *Railroad Co.* v. *Gill,* 66 Miss. 39, 5 South. 393; *Railroad Co.* v. *Fite,* 67 Miss. 373, 7 South. 223; *Railroad Co.* v. *Moore,* 79 Miss. 766, 31 South. 436; *Dorrah* v. *Railroad Company,* 65 Miss. 14, 3 South. 36, 7 Am. St. Rep. 629. Keeping before us this general rule, we can better understand whether the facts of a particular case falls within it.

Instructions 2, 3, and 4 given for the plaintiff, tell the jury substantially that if they believe from the evidence that after the train passed the station defendant arbitrarily, willfully, or out of spite, refused, without reasonable cause, *to back the train* on which plaintiff was a passenger, to Arcola, then in addition to compensatory damage the jury might assess punitive damage. Under the facts of this case no such instructions should have been

given. If Mrs. Hardie did not have the right to require
the train *backed*—if the employees had the right to re-
fuse to stop and back the train—when they refused they
did not violate any moral or legal right which Mrs. Har-
die could insist upon, and there was no liability for pun-
itive damages. It is true that, when a passenger train
has stopped at a station at a safe and proper place for
the landing of its passengers, but neglects to notify a
passenger and negligently carries such passenger by, the
passenger, on discovering that he has been carried by
his station, after the train had started to the next sta-
tion, may demand that the train be stopped and backed
for him to get off. If the demand is made and the em-
ployees refuse, will such refusal constitute willfulness so
as to authorize the imposition of punitive damage. We
say not. In the discussion of this question, it may not
be amiss to call attention to the fact that by section 4047,
Code 1906, it is required of a railroad company, when
backing a train of cars along a passenger depot, to be pre-
ceded by a servant not exceeding forty nor under twenty
feet in advance of same. This section is important in
this case only, as illustrative of the delay which would
be occasioned other passengers by yielding to the de-
mand to back the train, to say nothing of the possible
danger. The duty of the employees to a hundred other
passengers on the train holding carriage contracts, is as
sacred and obligatory as is the contract of the passenger
whom the company has negligently carried by. Shall a
railroad company be required to subordinate the public
duty which it owes, the safety, the convenience, and the
legal rights of a great number of passengers to the duty
owing to one? These are questions involved in this case,
but apparently overlooked by counsel. Every contract
of carriage with a railroad company carriers with it the
obligation on the part of the company to carry the pas-
sengers to his place of destination; to afford reasonable
opportunity to get on and off the train; to land the pas-

sengers at a safe and proper place. Every passenger
entering into such contract makes his contract in recog-
nition of this right in every other passenger. For any
violation of this contract on the part of the carrier actual
damage may always be recovered. For any capricious,
intentional, or willful violation of the contract, punitive
damage may be imposed; but we have not found one case
that has ever held that punitive damage may be imposed
under the facts of this case. Counsel cite authorities
which they claim decide as they contend, but an exam-
ination of the authorities demonstrate the error of the
contention. We must not forget the right of the many
in pursuing the grievance of one.

The employees of the carrier may be said to be the
trustees of the rights of every passenger on the train.
In considering the right of one, all others are not to be
forgotten. Each passenger has a right to reasonably
expect that the train will be run on schedule time; each
passenger may make his business arrangements predi-
cated of that idea. The safe handling of the train may
depend upon its schedule. Men of multiplied callings,
going from town to town, arrange their journeys on the
schedules; they make their business engagements with
reference to the schedules; arrangements as to mails are
based on train schedules; plans for the reception of per-
ishable freight; arrangements for the last sad rites of
funerals; anxious passengers hurrying to sick relatives
—all these may depend upon the maintenance of the
schedule. Shall these considerations of public impor-
tance all be brushed aside at the instance of one passen-
ger whom the carrier has negligently carried by his
proper destination? If this court should hold with the
contention of counsel for appellee, and say that punitive
damages may be inflicted in this case, it gives its assent
to a legal conclusion which seems to us illogical and un-
just. In such case, the infliction of punitive damages
would impede and not promote the public good; it would

lead to the endangerment and not the safe guarding of the traveling public. That the backing of a train to a station is a dangerous and unsafe thing, the legislature has declared by section 4047 of the Code of 1906. Since the allowance of punitive damage is justifiable only when it promotes the public good, such damage cannot be defended in this case wherein every consideration of public good is opposed to it.

In the case of *St. L., I. M. & S. Ry. Co.* v. *Lewis,* 69 Ark. 81, 61 S. W. 163, the Arkansas Supreme Court held that where a passenger had been negligently carried beyond his station, the carrier was not bound to take such passenger back to the station, the court saying that: "For the purpose of avoiding collisions, and of orderly and regular transportation, and of serving the public to the best advantage, trains should run on schedule time. The conveying passengers back to stations at which they should have left the train and failed to get off may, in some instances, defeat this purpose, and lead to disastrous consequences. A rule or regulation requiring railroad companies to do so would not only be unjust, but would be unwise, and against the interest of the public." We can evolve no logic nor find any authority to conflict with the rule declared in the *Lewis case, supra,* though, counsel cite the *Hurst case,* 36 Miss. 660, 74 Am. Dec. 785; *Kendrick case,* 40 Miss. 374, 90 Am. Dec. 332; *Higgins case,* 64 Miss. 80, 8 South. 176; and the *Lowry case,* 79 Miss. 431, 30 South. 634, announcing a rule different from the Lewis case. The above authorities are easily distinguished from the Lewis case; in fact, the principle controlling them has no analogy to the principle involved in the case we are now considering. In each of the authorities cited above, there was some element of willfulness, discourtesy, or reckless disregard of duty amounting to more than a mere failure of duty. In not one of the above authorities is it held that the refusal to

back, after negligently carrying a passenger by his station, warrants the imposition of punitive damage.

We first consider the case of *N. O. & G. N. R. R. Co. v. Hurst,* 36 Miss. 660, 74 Am. Dec. 785. What was that case? It appears that Hurst boarded the train at New Orleans for Quin's Station. He told the conductor this, and after the train left Magnolia, the station next before reaching Quin's, he again told the conductor and handed him his check. This was about two miles from the station at which Hurst wanted to get off. The conductor went into a rear car, and there remained until the train was passing the station. At this time the conductor came forward in a hurry, and as he passed Hurst said to him, "Where in the devil are you carrying me to?" The conductor made no reply, and the train passed the station some four hundred yards. Hurst and the conductor met on the platform, whereupon in an impudent manner the conductor told Hurst that was his place to get off. Hurst protested against getting off at that point, and about that time the conductor had his trunk put off of the train, and told Hurst if he did not leave the train he would carry him to Summit. Hurst demanded that the train be backed, but the conductor, refused, and this court held that the facts warranted the imposition of punitive damage by the jury. In the Hurst case there was proof tending to show negligence, willfulness, and insult. The train was not only run by the station, but there was evidence tending to show that it was capriciously done. Hurst's trunk was put off, and a threat made to carry him on to Summit if he did not get off. The court was right in the Hurst case, but the legal mind readily differentiates that case from the facts of this. In the case of *Southern Ry. Co. v. Kendrick,* 40 Miss. 374, 90 Am. Dec. 332, counsel's contention is not sustained. In the above case it appears that Mrs. Kendrick was carried by her station, and put off at a water tank, a mile and a half beyond. It appears that her

station was not called, and that her failure to get off was occasioned by the negligence of the company. The conductor refused to back the train, it is true; but sent Mrs. Kendrick back to her destination in charge of two negroes with torch lights. Mrs. Kendrick sought to recover punitive damage, but no instruction was asked telling the jury that the refusal of the conductor to back the train constituted any ground for the imposition of punitive damage, and the court did not so hold. The Kendrick case was tried on a different theory, as the instructions and facts show. Even in that case, the court said that it expressed no opinion as to whether the evidence was sufficient to sustain a verdict for exemplary damage. In the case of *M. & C. R. R. Co.* v. *Whitfield,* 44 Miss. 466, 7 Am. Rep. 699, the question involved here was not presented; no such question was in the Whitfield case, or any of the cases we have mentioned above. Whitfield was a passenger from Corinth to Chewalla. When the train reached his station it ran several hundred yards beyond without stopping. Whitfield demanded the backing of the train and the conductor made the signal, but the engineer did not heed it. The conductor then informed Whitfield that, owing to the condition of the track, the train could not be backed, and notified him that he must get off where he was. The ground was wet, icy, and slippery. It seems that there were steps on the car, used for the purpose of aiding passengers to get on and off. The conductor witnessed Whitfield trying to get off under these circumstances and at this improper place, and said nothing about the steps or attempted to render any assistance. In trying to get off under these conditions and at the place where the conductor forced him to leave, Whitfield slipped and dislocated and injured his knee. On the above facts the court held punitive damage could be inflicted. The facts of the Whitfield case shows its difference from the facts of the case on trial. Whitfield was forced to leave the

train at an unsafe and improper place. The duty owing
him by the carrier was recklessly disregarded, and no
attempt was made to provide for his safety. There was
in that case evidence of reckless and wanton indifference
to duty, but the case itself is a different case, on its facts,
from the case now being considered.

The question involved in this case was not involved
in the Higgins case in 64 Miss. 80, 8 South. 176. In the
above case Higgins held a ticket from Vicksburg to War-
renton. He boarded a freight train and was carried
three-fourths of a mile beyond the usual stopping place.
He requested the conductor to back the train, and the
conductor, in a harsh manner, refused to do so. Suit
was brought against the carrier, alleging the willful and
wrongful refusal to back the train, and Judge Campbell,
speaking for the court, said that punitive damage was
proper, stating that ''the recovery of five hundred dol-
lars is not an undue punishment for the wanton wrong
done appellee by carrying him three-fourths of a mile
beyond where he had a right to be stopped.'' In the
Higgins case there was not only a refusal to back, but
a willful and capricious violation of the carrier's duty to
stop at the station and allow Higgins to get off, as it was
the duty of the carrier to do. Even in the above case,
the court does not rest its opinion on any duty of the
carrier to back, the refusal of which constituted such
willfulness as to warrant the recovery of punitive dam-
age, but the opinion rests on the wanton wrong done Hig-
gins in carrying him by his station in the way it was
done. But this case is widely different on its facts from
the case now on trial, and let it be noted that the distin-
guished judge who wrote the opinion in the Higgins case
was the same judge that wrote the opinion in the *Gill*
case in 66 Miss. 39, 5 South. 393, to which we shall have
occasion to speak later on. The judge rendering the
opinion in the case of *Railway L. & P. Co.* v. *Lowry,* 79
Miss. 431, 30 South. 634, has already distinguished it

from the case now on trial by classifying it with that class of cases that hold that the imposition of punitive damage, on a carrier for carrying a passenger by his station, is proper in every case when it is done willfully, capriciously, or in gross and reckless indifference to the passenger's rights under his carriage contract. Law controlling the traveling public is practical, not theoretical; the right of one traveler is often relative and not abstract.

The case of *Davis* v. *Railroad Co.,* 95 Miss. 541, 49 South. 179, is not in point. Davis was not carried by any station. He was made to get off at a wrong station under such circumstances as, in the judgment of this court, constituted gross negligence. In the Davis case the court held the imposition of punitive damage proper. A casual glance at that case demonstrates its inapplicability to the facts of this case. Counsel for appellee cite the case of *Birmingham Ry. Co.* v. *Nolan,* 134 Ala. 329, 32 South. 715; *Alabama, etc., Ry. Co.* v. *Sellers,* 93 Ala. 9, 9 South. 375, 30 Am. St. Rep. 17, and *Samuels* v. *R. R. Co.,* 35 S. C. 493, 14 S. E. 943, 28 Am. St. Rep. 883. As to the last of the two above cited cases—that is to say the *Sellers case* in 93 Ala. 9, 9 South. 375, 30 Am. St. Rep. 17, and the *Samuels case* in 35 S. C. 493, 14 S. E. 943, 28 Am. St. Rep. 883—they find their classification in the cases already discussed; that is to say, the Hurst case, the Higgins case, and others. They are ordinary cases of the reckless, capricious, or wanton carrying a passenger by his station and forcing such passenger to leave the train at an improper place. In the *Nolan case, supra,* plaintiff's evidence showed that she boarded the car and paid the conductor her fare to Twenty-fifth street. When she paid the fare she told the conductor she desired to get off at Twenty-fifth street, and he said, "All right." The train did not stop to let her off when it reached her destination, but the bell cord was pulled by a gentleman, thus attracting the attention of the conductor. The con-

ductor was told that plaintiff desired to get off.at Twenty-
fifth street, but replied that the train did not stop there,
and that the lady would have to go to the next station.
The conductor thereupon gave the signal to the engineer
to go ahead, and plaintiff was carried to Woodwards
Crossing, about three-fourths of a mile further on, where
she got off and had to walk back. It was windy and
cold; the ground was wet and sloppy from snow that had
fallen. She was made sick, as the testimony shows, and
sued the railway company for simple negligence, and for
*willfully, recklessly, or wantonly refusing to put her off*
at the place where the conductor had promised he would.
The court held that the case warranted submitting the
question of punitive damage to the jury. The proof
showed that she told the conductor she wanted to get off
at Twenty-fifth station. She paid her fare to him to
go to that station. He accepted it and promised to let
her off there. His attention was called to it in time, and
he still refused to let her off, and carried her by.

Almost every case seeking the recovery of punitive
damage, like the prosecution for crime, must stand or
fall on the facts surrounding the particular case. Even
where a passenger train is run by a station without stop-
ping at all, or giving the passenger an opportunity to
get off, it is not in every case that punitive damage may
be imposed for the dereliction. In addition to running
by and failing to stop, there must be some element of
intentional or willful disregard of duty, or gross neglect;
mere inadvertence is not sufficient. *Dorrah* v. *Ill. Cent.*,
65 Miss. 14, 3 South. 36, 7 Am. St. Rep. 629; *K. C. M.
& B. R. R.* v. *Fite,* 67 Miss. 373, 7 South. 223.

Counsel for appellee cite the case of *Wilson* v. *R. R.
Co.,* 63 Miss. 352; *R. R. Co.* v. *Riley,* 68 Miss. 765, 9
South. 443, 13 L. R. A. 38, 24 Am. St. Rep. 309; *Howell*
v. *Shannon,* 80 Miss. 598, 31 South. 965, 92 Am. St. Rep.
609; *R. R. Co.* v. *White,* 82 Miss. 120, 33 South. 970;
*R. R. Co.* v. *Mitchell,* 83 Miss. 179, 35 South. 339; *R. R.*

*Co.* v. *Harper,* 83 Miss. 560, 35 South. 764; *R. R. Co.* v. *Reid,* 93 Miss. 458, 46 South. 146, 17 L. R. A. (N. S.) 344; *R. R. Co.* v. *Armstrong,* 93 Miss. 583, 47 South. 427; *Tel. Co.* v. *Hiller,* 93 Miss. 658, 47 South. 377; *Burns* v. *R. R. Co.,* 93 Miss. 816, 47 South. 640; all holding that if there is any element of the testimony on which an instruction for punitive damage can be based, it is not error for the court to grant the instruction, and the question is one then for the jury and not the court. Authority on this point was not needed. This court has consistently held as above indicated in every proper case. But this court has been equally clear in holding that where there is no testimony warranting the submission of such question to the jury, the court should refuse all instructions on that line. *Railroad Co.* v. *Smith,* 82 Miss. 656, 35 South. 168; *Railroad Co.* v. *Scurr,* 59 Miss. 456, 42 Am. Rep. 373.

Up to this time we have considered only the case cited by appellees, and relied upon by them as decisive of their contention. We have shown, we think, that these authorities have no application to the question in the case now under consideration. We will now discuss the authorities which, in our judgment, are controlling.

In the first place, in the case of *Vicksburg Ry. Co.* v. *Marlett,* 78 Miss. 872, 29 South. 62, this court held that: "A willful wrong that gives a cause of action for the imposition of exemplary damages, must be denoted by a wrongful act, done with a knowledge of its wrongfulness." When, under the facts of this case, the conductor refused to back, he was guilty of no wrongful act, and no punitive damage should have been allowed. In the case of *Chicago, St. Louis & N. O. R. R. Co.* v. *Scurr,* 59 Miss. 456, 42 Am. Rep. 373, a passenger was carried by his proper station by reason of the negligence of the conductor. It does not appear that a demand was made by the passenger for the backing of the train, but punitive damage was sued for, and the court held that

for a mere breach of duty no punitive damage could be assessed. In the case of *Miss. & Tenn. R. R. Co.* v. *Gill,* 66 Miss. 39, 5 South. 393, it appears that Gill and his wife were passengers destined for Senatobia. When the train arrived at that station, they undertook to get off, but were prevented by the crowding into the coach of a large number of excursionists. The train stopped a very short while, as was usual, and moved off before Gill and his wife could get off. When the train started, Gill called to a friend to pull the bell cord and signal the engineer to stop, which was done, and in doing so the cord was broken. When the train had gone about two or three hundred feet, the plaintiff saw the conductor, and demanded that he stop the train and allow himself and wife to get off, stating to the conductor that he had important business and that his wife was sick. The conductor refused to do it, stating that the train carried the United States mail and that he could not stop for anything. At the same time the conductor said to the plaintiff, "You have broken my bell cord, sir." Gill said this was said in an angry and insulting manner. The conductor informed Gill that there would be an excursion returning to Senatobia in an hour, and that he would see the conductor of that train about it, and Gill could return on it. Gill was carried to the next station, waited one hour and returned, paying his own fare therefor. On the above facts this court, speaking through Judge Campbell, said: "This is not a case for punitive damages even on the evidence produced by the plaintiff, and the court erred in not so ruling." The Gill case was a stronger case for the imposition of punitive damage than the case now being considered.

Let us parallel the cases and see if the rule in the Gill case can stand, and the case under consideration be affirmed. In the Gill case the employees of the carrier were guilty of negligence in letting the boarding passengers crowd on the train before the passengers to get

off had been enabled to do so. In the case on trial the employees were guilty of negligence in failing to call out Mrs. Hardie's station and see that she got off. But in both cases it was mere negligence. In the Gill case before the conductor discovered that Gill had been carried by, the train had started to its next station. In the case now on trial, the facts are the same. Gill told the conductor that he had important business, and that his wife was sick. Mrs. Hardie had no particular pressing business, but she told the conductor she was sick. The distance the train had traveled from the station was about the same, the distance being a little shorter in the Gill case, if there was any difference. From this point the facts differ somewhat, the difference being that the facts show a stronger case for the imposition of punitive damage in the Gill case than in the case now being considered. Gill testifies that the manner of the conductor was angry and insulting. Mrs. Hardie says the manner of the conductor toward her was courteous; she makes no complaint on that score. Gill demanded only that the train stop, and let him and his wife off where it then was. He did not ask to have it backed. Mrs. Hardie demanded that it stop and take her back to her station. Gill went back on the next train and paid his own fare, but Mrs. Hardie was carried back at the expense of the railroad. If the Gill case is not to be overruled, the present case cannot be affirmed. The same judge that delivered the opinion in the *Higgins case,* in 64 Miss. 80, 8 South. 176, delivered the opinion in the Gill case, and counsel representing Gill cited the Higgins case as authority for the allowance of punitive damage in the Gill case. Counsel for appellee may read the Gill case and ponder over the facts of the case now on trial, but they can never reconcile an affirmance of this case with a continued adherence by this court to the rule declared by the Gill case. In fact, the court might have held in the Gill case that punitive damage could be im-

posed and still this case would have to be reversed, as there are essential differences in the facts.

We doubt not but that, when logic shall have driven away partisan zeal, and counsel shall have had time to study their case in an earnest search for the true and just rule that should control—the kind of search which controls this court in the decision of every case, great or small—they will satisfy themselves of their error.

Suggestion of error is overruled. *Overruled.*