SANDERSON *v.* PARSONS *et al.*

(In Banc. Nov. 8, 1943. Suggestions of Error Overruled Feb. 14, 1944.)

[15 So. (2d) 513. No. 35413.]

(In Banc.   Feb. 14, 1944.)

[16 So. (2d) 774.   No. 35413.]

Vollor & Teller, of Vicksburg, for appellant.

878

Brunini & Brunini, of Vicksburg, for appellees.

Argued orally by **Landman Teller**, for appellant, and by
**E. L. Brunini**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

We are to determine on this appeal (1) whether appellant, as executrix of and the sole beneficiary in the will of Dr. G. P. Sanderson, her deceased husband, is the owner of a one-third or a one-sixth interest in the assets of the Vicksburg Clinic, a partnership, of which Dr. Sanderson was a member at the time of his death October 30th, 1941; and (2) who, as between appellant and appellees, Drs. Knox and Parsons, is the owner of seventy-five shares of stock in the Vicksburg Hospital, Inc.

The chancellor decreed appellant to be the owner of a one-sixth interest in the Clinic and appellees to be the owners of the stock.

The guiding lights are rather dim. We must determine the questions from a construction of two contracts made between Dr. Sanderson and appellees, the circumstances surrounding their making and subsequent developments thereunder.

Does appellant own a one-third or a one-sixth interest in the Clinic? We limit the ownership to those alternative percentages because counsel for the parties so limit the question on this appeal; otherwise a one-fourth interest might enter into the question.

On March 1st, 1939, Drs. Sanderson, Knox and Parsons were all engaged in the practice of medicine in Vicks-

burg, Mississippi. The latter two were also surgeons. It is
not clear whether Dr. Sanderson was also a surgeon. Drs.
Knox and Parsons and one Dr. Robert operated the Vicks-
burg Clinic, a partnership, but all the assets appear to
have been owned by Knox and Parsons. There were sev-
eral other doctors employed by the Clinic, receiving des-
ignated monthly salaries for their services, but they were
not partners therein. On that day Drs. Knox, Parsons
and Robert, as first parties, entered into a lengthy written
agreement with Dr. Sanderson, as second party, under
which Dr. Sanderson became a partner in the Vicksburg
Clinic. The contract provided for joint operation of the
Clinic by these four doctors, and each was to give his
entire time and services to the partnership, except such
practice as he might do for his immediate family; each
partner was to keep an accurate daily account of the
services performed, and the fees and charges therefor,
and that all fees and charges and money should be col-
lected by, and handled through the books of, the Clinic,
which books should be open to the partners at all times;
that the equipment and accounts receivable of the parties
would be "pooled," with some named exceptions. It
then provides for the compensation of the parties to the
contract and certain employees of the partnership, the
provision here pertinent reading as follows: "18. That
the compensation of the said Dr. G. P. Sanderson shall be
computed and paid monthly in the following manner;
On the first Three Thousand ($3000.00) Dollars net col-
lected per month by the said Vicksburg Clinic, the said
Dr. G. P. Sanderson shall receive one-sixth or 16 2/3 per
cent and Dr. W. H. Parsons and Dr. I. C. Knox to share
the remainder of the net proceeds collected from the said
Clinic as may be mutually agreed between them, or as
provided by any contract that may be in existence at the
time of the execution of this partnership agreement pro-
viding for division of fees or other income derived from
the said Clinic; of the next $1000.00 net collected, or frac-
tion thereof, the said Dr. G. P. Sanderson is to receive

twenty-five per cent and the said Dr. I. C. Knox and W. H. Parsons are to receive the remainder to be divided between them on the same basis as applied to the division of the balance of the first Three Thousand ($3000.00) Dollars; all net collections of the Vicksburg Clinic over and above Four Thousand ($4000.00) Dollars shall be divided equally between the said Dr. I. C. Knox, Dr. W. H. Parsons and Dr. G. P. Sanderson.''

Dr. Robert later withdrew from the partnership and disappears therefrom and his relation thereto has no bearing on the question under consideration. The partnership, by express terms of the agreement, was to terminate December 31st, 1942.

Dr. Sanderson contributed to the partnership at the time of its formation accounts receivable in the sum of $5,593.58 and Drs. Knox and Parsons such accounts in the aggregate of $91,647.63. The respective actual values of these accounts is not shown. No other assets were contributed by either party.

The agreement was faithfully carried out by all parties until the death of Dr. Sanderson October 30th, 1941. It lasted thirty-two months, during which these three doctors were paid by the Clinic the total sum of $98,259.36. In eighteen months of this period the disbursements were more, and in fourteen months thereof were less, than $3,000, the monthly average for the thirty-two months being $3,070.60. Presumably, although the record does not show, the disbursements to the individuals were in accordance with the terms of the contract.

At the time of the death of Dr. Sanderson the only assets of the partnership were outstanding accounts receivable aggregating $108,163.58. These were valued by the appraisers at $28,889.47. Dr. Parsons was appointed administrator of the partnership assets on the death of Dr. Sanderson. During the fourteen months before the filing of this bill he had collected of these accounts a total of $20,025.07, during which time the monthly collections, except for one month, never exceeded $3,000. No point

is here made on the excess over $3,000 for that one month. Of such total collections Dr. Parsons, as such administrator, has paid to appellant one-sixth, which she has accepted without prejudice to her rights herein. This leaves outstanding uncollected accounts of the Clinic of approximately $88,000, the estimated value of which is not shown in this record.

We have given careful consideration to the contentions made on this appeal by both parties, and, without undertaking to detail them, have concluded that appellant owns a one-sixth interest in this partnership. It is true, as appellant urges, the contract speaks of the relation as that of partners and says they are pooling the assets; that the parties had equality of control and management, yet these things, while persuasive, do not necessarily determine the respective ownership of the parties in the assets of the partnership. It is also a correct principle of law, as she contends, that "In the absence of competent evidence of an agreement to the contrary, partners are presumed to have equal interest in the firm . . . ," 47 C. J. Sec. 222, pg 782; Randle v. Richardson, 53 Miss. 176, but it is also stated in that same section ". . . partnership contracts providing for unequal or particular interests will contol." We think the contract, supplemented by the acts of the parties, does that in this case. It provided that Dr. Sanderson should receive a smaller percentage of compensation than Drs. Knox and Parsons, under the method of making collections and doing business and contemplated by the parties. Had Dr. Sanderson lived, his compensation, based upon the monthly distributions made during his life, would never have amounted to an equal interest with that of Drs. Knox and Parsons. We do not think his death vested in his estate a greater interest than he himself would have received while living and contributing his services to the partnership. But supplementing this contract is the very important fact that Drs. Knox and Parsons contributed to the partnership accounts of the aggregate face value

almost seventeen times greater than did Dr. Sanderson. The accounts receivable so placed in the partnership were all for services of these doctors in the same vicinity and we may fairly assume were of about equal average collectability. The partnership, by the terms of the contract, was to expire December 31st, 1942. Thus the excess contribution to assets by Drs. Knox and Parsons was to inure to the benefit of Dr. Sanderson in three years and ten months, but by his death did so inure within a period of two and two-third years. The conclusion we have reached is, we think, not only justified by the contract and the facts, but is just and equitable. We affirm the chancellor on this question.

On the question of the ownership of the stock, Drs. Sanderson, Knox and Parsons, concurrently with and as a part of the partnership agreement, entered into the stock agreement the reporter will set out in full.[1]

---

[1]"Memorandum of Agreement between Dr. I. C. Knox and Dr. W. H. Parsons, Parties of the First Part, and Dr. G. P. Sanderson, Party of the Second Part,

"Witnesseth

"Whereas, the party of the Second Part is this day becoming associated with the Parties of the First Part and Dr. W. P. Robert in the general practice of medicine and surgery under the firm name of 'Vicksburg Clinic,' evidenced by partnership agreement of even date herewith, which is made a part of this contract and is to be considered a part of same as if copied herein in full; and

"Whereas, the said Vicksburg Clinic comprises the staff of the Vicksburg Hospital, with Dr. I. C. Knox and Dr. W. H. Parsons owning a majority of the stock thereof.

"Now, therefore, for the consideration hereinafter set forth and the mutual benefits to be derived therefrom it is hereby agreed;

"1. That Dr. W. H. Parsons and Dr. I. C. Knox each on the execution of this instrument transfer and deliver unto the said Dr. G. P. Sanderson fifty (50) shares of stock in the Vicksburg Hospital.

"2. That the said Dr. G. P. Sanderson shall pay in cash on the execution of this instrument and the delivery of said fifty (50) shares of stock Twelve Hundred and Fifty ($1250.00) Dollars to Dr. W. H. Parsons and Twelve Hundred and Fifty ($1250.00) Dollars to Dr. I. C. Knox, which sum shall be payment in full for twelve and one-half

The Hospital then had outstanding 471 shares of stock, all non-income bearing, of which Dr. Knox and his family owned 254½ shares and Dr. Parsons and his family owned 140½ shares. On the execution of the stock agreement Dr. Sanderson paid Drs. Knox and Parsons each $1,250 for twenty-five shares of stock, and executed the notes for the deferred payments for the other seventy-five shares of stock mentioned in the contract. He paid the installments due one and two years after the date of this contract. When he died seventy-five shares of the stock of the Hospital stood in his name on the books of that cor-

---

(12½) shares of stock in the said Vicksburg Hospital transferred to said Dr. G. P. Sanderson by both Dr. I. C. Knox and Dr. W. H. Parsons.

"3. That the said Dr. G. P. Sanderson shall make and deliver unto Dr. W. H. Parsons his three promissory non-negotiable notes for Twelve Hundred and Fifty ($1250.00) Dollars each, one of said notes maturing on the 1st day of March in each of the years 1940, 1941 and 1942, said notes to bear interest at the rate of six per cent per annum after maturity, and are to be secured by thirty-seven and one-half (37½) shares of stock of the Vicksburg Hospital transferred by the said Dr. W. H. Parsons to the said Dr. G. P. Sanderson.

"4. That the said Dr. G. P. Sanderson shall make and deliver unto Dr. I. C. Knox his three promissory non-negotiable notes for Twelve Hundred and Fifty ($1250.00) Dollars each, one of said notes maturing on the 1st day of March in each of the years 1940, 1941 and 1942, said notes to bear interest at the rate of six per cent per annum after maturity, and are to be secured by thirty-seven and one-half (37½) shares of stock of the Vicksburg Hospital transferred by the said Dr. I. C. Knox to the said Dr. G. P. Sanderson.

"5. That in the event of the death or retirement from practice of the said Dr. W. H. Parsons all notes then due and unpaid shall be cancelled, but in such eventuality, the said Dr. G. P. Sanderson shall reconvey to the said Dr. I. C. Knox and Dr. W. H. Parsons, or their successors and assigns, a sufficient number of shares of Vicksburg Hospital stock, on a $100.00 par value basis, to equal in amount the unpaid note or notes.

"6. That, provided such can be obtained for a reasonable premium, life insurance on the life of Dr. G. P. Sanderson in the sum of Twenty-five Hundred ($2500.00) Dollars shall be immediately taken out and paid for by the Vicksburg Clinic, and as the notes provided for herein are paid, additional life insurance in like amount shall be

poration. After the execution of this agreement two insurance policies, each for $2,500, were taken out on the life of Dr. Sanderson in the Equitable Life Assurance Society of the United States, both payable to Mrs. Sanderson, his wife, the appellant. The dates of these policies are not shown in the record. However, they were in force on the death of Dr. Sanderson and apparently have been collected by the beneficiary therein. It also appears that the Clinic paid the premiums on these policies, but the last quarterly premium, paid October 7th, 1941, was refunded to the Clinic by the Hospital October 17, both the payment and the refund being made after Dr. Sander-

---

taken out and paid for by the Vicksburg Clinic. The said Dr. G. P. Sanderson shall designate the beneficiary in said policies.

"7. That on the death of the said Dr. G. P. Sanderson while said policies are in force, the shares of Vicksburg Hospital stock herein conveyed to the said Dr. G. P. Sanderson shall, by virtue of this agreement, revert to the said Dr. W. H. Parsons and Dr. I. C. Knox. The said Dr. G. P. Sanderson shall have the right at any time of assuming the payment of the premiums on said policies and in such eventuality the provisions of this paragraph shall be null and void.

"8. It is further understood and agreed, and this instrument shall be construed as a trust agreement to be in full force and effect until the notes hereinabove mentioned are fully paid, and to that end the notes executed by the said Dr. G. P. Sanderson shall be non-negotiable and the shares of stock transferred to him by the said Parties of the First Part shall be non-assignable until they have been fully paid for; that is to say, that the thirty-seven and one-half (37½) shares of stock transferred to the Party of the Second Part by Dr. I. C. Knox and the thirty-seven and one-half (37½) shares of stock transferred to the Party of the Second Part by Dr. W. H. Parsons shall remain as collateral security to the notes executed by the Party of the First Part until said notes have been paid, and as each Twelve Hundred and Fifty ($1250.00) Dollar note is paid and satisfied, twelve and one-half (12½) shares of stock shall be released from the terms of this agreement and shall become the property of the Party of the Second Part.

"9. That Dr. G. P. Sanderson shall have the sole right to vote said stock during the existence of this agreement.

"Dated at Vicksburg, Mississippi, on this 1st day of March, 1939."

son had gone to the Hospital during his last illness. It is claimed by appellant that Dr. Sanderson had assumed the payment of the premiums on these policies, but the record does not substantiate that claim. However, it is also shown that sometime during the summer of 1941, by agreement of all parties, another insurance policy was taken out on the life of Dr. Sanderson for $7,500 in the Provident Life and Accident Insurance Company payable to the Hospital as beneficiary. This policy was in force when Dr. Sanderson died. It was the practice of the Hospital to carry insurance on the doctors owning its stock, and by this method retire its outstanding stock. It appears clear that the Provident policy was taken out to replace the Equitable policies insofar as the Hospital and Clinic were concerned and to increase the insurance $2,500, in accordance with the contract provision to so increase it, as the annual notes were paid, Dr. Sanderson having paid $7,500 to that time. Dr. Knox, as a witness, made this very frank statement: ''The agreement was that we were to sell to Dr. Sanderson fifty shares of stock each, and that this would be payable $1250 a year to each of us, and each year he would take out $2500.00 insurance to cover this stock, provided a reasonable rate could be secured, . . . that reasonable rate was not secured, as you understand, although we agreed to it, and for two years we went along with the Equitable policies—two years $2500.00 each year; during that time negotiations were made to secure a policy at a more reasonable rate, and this was finally done with another company, the Provident Life & Accident Company, . . . '' Again he said: ''Well, the $7500 was taken out, not only to take over the other policy, but also additional $2500.00 which he was to pay for that year.''

We think this stock was owned by Dr. Sanderson at the time of his death. It will be noted that by paragraph 8 of the agreement it is provided ''and as each twelve hundred and fifty ($1,250.00) dollar note is paid and satisfied, twelve and one-half (12½) shares of stock shall

be released from the terms of this agreement and shall become the property of the Party of the Second Part.'' It evidently had been released because seventy-five shares had been transferred on the books of the corporation to Dr. Sanderson and there stood in his name as owner when he died. It is undisputed, too, that he had fully paid for these seventy-five shares. It would be manifestly unfair and inequitable for Drs. Knox and Parsons to be now declared the owners of this stock after Dr. Sanderson has fully paid them for it. It will be kept in mind that the Hospital is not a party to this suit, nor is the title to the insurance policies, either the Equitable or the Provident, or liability for premiums, involved in this case. The only question is whether this stock, so paid for by Dr. Sanderson and standing to his name on the books of the corporation, belongs to his estate or to Drs. Knox and Parsons, who have received full pay therefor. If the Hospital is to be considered then it has insurance to retire this stock if it wishes so to do and to that extent is benefited by this transaction. It is clear to us it was the intention of the parties that the Provident policy was substituted for the Equitable policies, with an increase of $2,500 in the Provident policy, and Dr. Sanderson, having then in existence payable to his wife the Equitable policies, deemed it wise to retain them for his and his wife's benefit. We hold that Dr. Sanderson was the owner of the seventy-five shares of stock in dispute at the time of his death and, consequently, appellant is the owner at this time.

Affirmed in part, reversed in part, and remanded.

### CONCURRING OPINION.

**Smith, C. J.**, delivered a concurring opinion.

Since this partnership contract does not vest Dr. Sanderson with full equality with the other members thereof in the partnership assets and contains no provision for the distribution thereof on the dissolution of the partnership, it is extremely difficult to determine what the inter-

est of Dr. Sanderson's executrix is in these partnership assets; and any decision I might reach in the matter would be involved in grave doubt. I do not think she was entitled to a one-third interest therein, but my best judgment is—I am tempted to say my best guess is—that she is entitled to more than a one-sixth interest therein, arrived at by applying to these assets the provision of the contract setting forth what Dr. Sanderson should receive from the partnership income. But what that interest is, on this evidence, I am unable, with any confidence, to say.

ON SUGGESTION OF ERROR.

**Roberds, J.,** delivered the opinion of the court on suggestion of error.

Appellees have suggested that we were in error in holding that Mrs. Sanderson, appellant, is the owner of the stock in the Vicksburg Hospital. Appellant suggests that we erroneously held that she was not entitled to a greater percentage than one-sixth in the assets of the Vicksburg Clinic. We have re-examined the questions again and are satisfied with our conclusions in both respects. However, appellant further suggests that the statement in the original opinion [15 So. (2d) 513, 514], reading, "At the time of the death of Dr. Sanderson the only assets of the partnership were outstanding accounts receivable, aggregating $108,163.58," is also erroneous. It is suggested that there may be other property of the partnership, such as furniture, fixtures, surgical equipment, instruments, etc. The record contains an agreement of counsel: "That a detailed inventory of the accounts receivable and appraisement thereof was made by Wesley Lominick, W. L. Tucker and George W. Rogers, as appraisers, reflecting as of the date of death of the Decedent that the partnership of the Vicksburg Clinic possessed accounts receivable of the book value of $108,-163.58, which were appraised as having a then present

actual value of $28,889.47." In appellant's original brief she said: "An appraisement of its assets was made (T. P. 65) and the appellee W. H. Parsons qualified under the governing statute as Administrator of the partnership assets, posting $30,000.00." The reference in the brief to page 65 of the transcript is to the foregoing agreement, showing that appellant herself designated the accounts receivable as the assets of the partnership. It will be noted that the bond required of the administrator is slightly greater than the appraised value of the accounts receivable. In addition to this, the entire arguments of counsel on both sides on the original appeal proceeded upon the assumption that such bills receivable constituted the entire assets. Therefore, the conclusion that there were no other assets was correct, based upon the record before us. However, the purpose of the decision was the construction of the contract, and not to determine the extent of the assets of the partnership; therefore, if there are other assets, the opinion neither precludes nor concludes the ascertainment and determination of that fact.

Suggestions of error overruled.

**Smith, C. J.,** adheres to the views hereinbefore expressed by him.

DISSENTING OPINION ON SUGGESTION OF ERROR.

**McGehee, J.,** delivered a partially dissenting opinion on suggestions of error.

I agree that the suggestion of error filed by the appellees should be overruled, but I am of the opinion that the court is in error in adhering to its former decision herein whereby it was held that the interest of each partner in the firm assets as of the date of the dissolution of the partnership is to be determined upon the basis of the monthly "compensation" received by them for services rendered, respectively, during the operation of the business.

In view of the fact that the contract relationship of the parties was to expire on December 31, 1942, by the terms of their agreement, and of course earlier in the event of the death of a member of the partnership, as proved at the end of 32 months to be the case here, I do not think that it was ever intended by the partners, or either of them, that upon a dissolution of the firm, because of the death of a member or on account of the expiration of their articles of partnership, that the share of each in the assets would depend upon the amount collected each month thereafter. When we affirmed the decision of the lower court which held that such interest may be so determined under the contract of partnership in this case, the original opinion rendered by the majority recognized that ''In the absence of competent evidence of an agreement to the contrary, partners are presumed to have equal interest in the firm,'' citing 47 C. J., sec. 222, p. 782; Randle v. Richardson, 53 Miss. 176. Here the contract is entirely silent as to the interest that each partner was to have in the assets upon the dissolution of the firm, and there was no evidence offered, either competent or otherwise, as to any agreement in that behalf not expressed therein.

It is true that the text of 47 C. J., sec. 222, supra, further states that ''partnership contracts providing for unequal or particular interests will control.'' However, there seems to me to be a very vital difference between an agreement for unequal compensation to be drawn by the partner from the firm's business each month for services rendered while that business is a going concern and an agreement for an unequal interest in the partnership assets upon its dissolution. For instance, partners in a mercantile business may draw unequal compensation each month for services rendered, due to the fact that one may be devoting his whole time to the business while the other is devoting part of his time thereto and the remainder to his farm, without such an arrangement in any manner affecting the interest that each shall have

in the partnership assets upon the death of either or the dissolution of the firm from any other cause. Again, both of them may devote their entire time to the business and one of them draw the larger compensation each month due to his superior business ability and experience in their particular field of endeavor. Hence, it would be unsafe, and I fear would disturb settled legal principles, to measure their interest in the firm assets on the basis of what each one had drawn for a monthly allowance for services rendered.

In the instant case, I am unable to see why each partner would not be entitled to have his interest in the partnership assets determined on the dissolution of the firm by what the accounts receivable and other assets may have been then worth in bulk or by the total realized from liquidation instead of on a basis of how much could be collected per month thereon.

It should perhaps be said in reference to this suggestion of error on behalf of the appellant, that the brief submitted thereon is not as respectful in tone as it should have been; and that the intimations therein contained are calculated to mar an otherwise excellent brief, replete with good reasoning and to my own mind unanswerable logic in support of the suggestion of error submitted on the proposition hereinbefore discussed.

There are times when before preparing a suggestion of error counsel would do well to read what was said by Chief Justice Mayes in the fifth paragraph of the opinion on suggestion of error in the case of Yazoo & M. V. R. Co. v. Hardie, 100 Miss. 132, 55 So. 42, 967, 34 L. R. A. (N. S.), 740 742, Ann. Cas. 1914A, 323; and by Justice Griffith in the last paragraph of such an opinion in the case of Byrd v. Board of Supervisors, 179 Miss. 880, 890, 176 So. 386, 910, and in which latter opinion it was stated that "the office of a suggestion of error is to furnish light, not heat."